(No. 23475.—

THE JOSEPH TRINER·CORPORATION, Appellee, *vs.* CARL W. McNEIL, Appellant.

*Opinion filed June 10, 1936.*

J. Herzl Segal, for appellant.

Moses, Kennedy, Stein & Bachrach, (Walter Bachrach, Stanley Morris, R. Weyand, and Hamilton Moses, of counsel,) for appellee.

Mr. Justice Wilson delivered the opinion of the court:

This is a proceeding instituted by the plaintiff seeking relief under the provisions of the Fair Trade act, approved July 8, 1935. (Ill. State Bar Stat. 1935, p. 3091; Smith's Stat. 1935, p. 2893.) The title of the statute expresses its purpose as "An act to protect trade-mark owners, distributors and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a trade-mark, brand or name." Section 1 provides:

"Sec. 1. No contract relating to the sale or re-sale of a commodity which bears, or the label or content of which bears, the trade-mark, brand or name of the producer or

owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of Illinois by reason of any of the following provisions which may be contained in such contract:

"(1) That the buyer will not re-sell such commodity except at the price stipulated by the vendor.

"(2) That the producer or vendee of a commodity require upon the sale of such commodity to another, that such purchaser agree that he will not, in turn, re-sell except at the price stipulated by such producer or vendee.

"Such provisions in any contract shall be deemed to contain or imply conditions that such commodity may be re-sold without reference to such agreement in the following cases:

"(1) In closing out the owner's stock for the purpose of discontinuing delivery of any such commodity: provided, however, that such stock is first offered to the manufacturer of such stock at the original invoice price, at least ten (10) days before such stock shall be offered for sale to the public.

"(2) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(3) By any officer acting under the orders of any court."

There appears to be no serious contention that the act, up to this point, is invalid and unenforcible. We are particularly concerned with section 2, which declares that "willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby." The third section provides that the act shall not apply to any contract or agreement between producers

or between wholesalers or between retailers as to sale or re-sale prices. The Fair Trade act thus permits vertical re-sale price maintenance, but condemns, as do the Federal and State Anti-trust laws, horizontal arrangements for fixing prices. The act prescribes no criminal penalties.

The facts upon which this action is predicated are not in dispute. Schenley Distributors, Inc., licensed to transact business in Illinois, is the sole sales agent and representative in this State for certain liquors and alcoholic beverages manufactured by several affiliated distilleries known as the Schenley distilleries. "Old Quaker" is the brand name of one of the Schenley products, and the name has been duly registered as a trade-mark with the United States patent office. Affixed to each bottle of Old Quaker is a distinctive label, upon which appear the figure of a Quaker standing before a sheaf of grain, a sack of malt, and three barrels marked "Old Quaker Whisky." Above the picture is the legend, "Bottled at the Distillery. Old Quaker. Reg. U. S. Pat. Off. Brand." The name "Old Quaker" appears in bold lettering. Below the picture there is this statement: "One pint. Straight bourbon whisky. Distilled and bottled by the Old Quaker Company. Distillers. Lawrenceburg, Indiana. Division of Schenley Products Company." The whisky has been sold and retailed under the trade-mark which definitely designates the brand and has become well known to the trade. This brand is retailed at $1.89 per quart, 98 cents per pint and 50 cents per one-half pint. These prices, under existing conditions, appear to be fair prices when considered with like commodities.

The method of merchandising Old Quaker, as set forth in the complaint, is as follows: Schenley Distributors, Inc., the sales agent, sells to ten wholesale distributors in Chicago, one of whom is the plaintiff, suggesting to these local distributors a minimum retail price which it fixes as the uniform retail price for Old Quaker and each of the other brands of Schenley products to be sold in Chicago. This

price is the uniform and standard Schenley retail price. If a distributor sells to a retailer who is known to sell below the Schenley list price, Schenley Distributors, Inc., refuses further to sell Schenley products to such distributor. The distributors, in turn, refuse to sell Old Quaker, or any other Schenley product, to any retailer in Chicago except on the condition that such retailer will not sell below the uniform Schenley retail price. To that end the plaintiff and the other local distributors make all sales of Old Quaker or other Schenley products under agreements of sale denominated "Fair Trade Agreements," which expressly provide that the retailer will not re-sell in the city except at the uniform and standard Schenley retail price. From the allegations of the complaint it further appears that as a direct result of the trade policy and practice described, approximately eighty-five per cent of the retailers of Schenley products in Chicago consistently maintain the Schenley retail price list for Old Quaker and other Schenley brands.

The Joseph Triner Corporation, the plaintiff, is a domestic corporation engaged in business in Chicago as a wholesale distributor, selling to retailers for re-sale in that city various brands of liquor and alcoholic beverages of standard quality. On November 8, 1935, it brought an action in the circuit court of Cook county to restrain Carl W. McNeil, the defendant, a retail liquor dealer, from selling Old Quaker whisky in the Chicago district at prices less than those provided in the fair-trade agreements previously mentioned. From the allegations of the complaint, which the defendant by his motion to dismiss admitted to be true, it appears that the plaintiff was also operating pursuant to the trade policy and practice by which the Schenley Distributors, Inc., sought to maintain the prices specified in the fair-trade agreements.

The complaint charges that a few vendors of liquor at retail in Chicago pursue a practice of "cutting" the prevailing retail price of brands of liquor which have acquired

widespread attention and public favor. These retailers, it is charged, sell the popular brands at prices conspicuously lower than the prevailing price and at a loss or scant return to themselves, for the purpose of attracting the public to their stores and selling other brands of liquor or general merchandise at prices sufficiently high to meet the loss and assure a general profit. The use of "leaders" in this familiar form of price-cutting is asserted to cause irreparable loss not only to the producer of brands sold at the cut-price and to the distributors of such brands but also to the ultimate consumers or general public.

The plaintiff, at the time of filing its complaint, had established a substantial and profitable business in selling at wholesale Old Quaker and other Schenley products in Chicago. A valuable asset of its business is the good will of the retailers who purchase from it for re-sale in the city the various brands of Schenley products, including Old Quaker. Similarly, the good will of the public and consumers who purchase such products is deemed an important asset. According to the complaint a uniform price assures the retailers comparative immunity from injurious price-cutting by other retailers and a reasonable profit upon their retail sales.

In October, 1935, the defendant, with full knowledge of the fair trade agreements entered into by the plaintiff and the other local Schenley distributors with substantially all the retailers of liquor in Chicago, threatened to sell, offer for sale and advertise for sale at retail a quantity of Old Quaker at a price appreciably below the uniform Schenley retail price for the brand stipulated in the contracts. On October 16 the plaintiff informed the defendant of its trade policy in maintaining a uniform price for Old Quaker and other Schenley brands throughout the city. In particular, the defendant was advised of the provisions of the fair trade agreements executed conformably to the Fair Trade act. He was also informed of the irreparable in-

jury which would result to the plaintiff if he persisted in executing his threat to "cut" the price of Old Quaker. The plaintiff specifically requested the defendant to refrain from his contemplated course and indicated its willingness to sell to him any Schenley products he might wish, provided he would agree not to sell them at retail below the standard list price. Subsequently, on several occasions the defendant offered for sale, and sold, large quantities of Old Quaker at seventy-seven cents per pint, or more than twenty per cent below the Schenley uniform retail price. The defendant was again urged to desist but refused. On November 8, 1935, he advertised Old Quaker for sale at seventy-seven cents per pint. None of the quantity advertised or sold by the defendant at the cut-price was offered for sale, or sold, in the course of closing out any of such quantity for the purpose of discontinuing deliveries, nor because any of the liquor was damaged or deteriorated, nor owing to a court order. In short, the defendant does not come within the exceptions enumerated in section 1 of the Fair Trade act. During this time Old Quaker was in fair and open competition with about ten other brands of the same general class of commodity produced by persons other than the manufacturers of Schenley products.

The plaintiff charged that as a consequence of the defendant's conduct a great number of retailers in the area where the defendant's store was located threatened to violate their contracts with it and the other local Schenley distributors by meeting the competitive price fixed by the defendant, and that several of the retailers did, in fact, breach their agreements. The result of meeting the cut-price established by the defendant was that the sales at the reduced prices did not yield the retailers a fair and reasonable profit, and that when the public requested Old Quaker some of the merchants offered their customers substitute brands.

The concluding allegations of the complaint are, that if the defendant continues his practice the plaintiff will suf-

fer irreparable injury to its business in the following respects: (1) Retailers who have signed fair trade agreements will be compelled to violate their agreements and sell below· the Schenley standard price; (2) the cut-price will cause the public and consumers to believe that Old Quaker is not worth the uniform retail price, and, in consequence, the retailers will be unable to sell at the standard price; (3) great loss to the good will established by the local distributors will ensue and the value of the trade-marks and trade-names of the Schenley products destroyed; (4) the public will become confused as to the various brands of such products; and (5) the market for them in Chicago will become demoralized and produce a general uneconomic lowering of prices.

The acts of the defendant previously set forth constituted, according to the plaintiff, an imminent threat to the destruction of its business. Money damages, it was claimed, would not compensate the plaintiff, and restraint of the defendant was alleged to be necessary to prevent multiplicity of legal proceedings.

The defendant, by a motion to dismiss the complaint, challenged the constitutionality of the Fair Trade act. The court held the statute valid and overruled the motion to dismiss. The defendant elected to abide by his pleading, and a decree was entered permanently enjoining him from vending at retail Old Quaker whisky at a price below $1.89 per quart, 98 cents per pint, and 50 cents per one-half pint, until the standard and uniform Schenley retail price for the brand named should be changed in Chicago. To obtain a reversal of that decree the defendant prosecutes this appeal.

The defendant contends that the decree is erroneous for the reason that the Fair Trade act violates the Federal and State constitutions in the particulars set forth in his motion to dismiss the plaintiff's complaint. The propriety of the remedy employed is not assailed. The single ques-

tion thus presented for decision is whether the statute squares with the Federal and State constitutions or offends them in the respects assigned and argued by the defendant.

The contention is made that the Fair Trade act violates the equal protection of the laws provision of the fourteenth amendment to the Federal constitution, the due process clauses of the Federal and State constitutions, and also section 22 of article 4 of the State constitution. To sustain the decree the plaintiff maintains that the Fair Trade act constitutes a valid exercise of the police power, and that the statute is not open to the constitutional objections interposed.

The police power may be exercised not only in the interest of the public health, morals, comfort and safety but also for the promotion of the general welfare. (*Fenske Bros.* v. *Upholsterers Union,* 358 Ill. 239; *City of Aurora* v. *Burns,* 319 id. 84.) The case last cited contains a notable exposition of the doctrine that the police power of the State is not a static or dormant concept but is sufficiently dynamic to meet the varying needs of modern society. This court, in sustaining the validity of a zoning ordinance, observed: "With the growth and development of the State the police power necessarily develops, within reasonable bounds, to meet the changing conditions. (*Public Utilities Com.* v. *City of Quincy,* 290 Ill. 360.) The power is not circumscribed by precedents arising out of past conditions, but is elastic and capable of expansion in order to keep pace with human progress. Mr. Justice Holmes well defined the nature and extent of the power in *Noble State Bank* v. *Haskell,* 219 U. S. 104: 'It may be said in a general way that the police power extends to all the great public needs. (*Camfield* v. *United States,* 167 U. S. 518.) It may be put forth in aid of what is sanctioned by usage or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare.' "

568

Legislatures have long endeavored to promote free competition by laws aimed at trusts and monopolies such as the Anti-Trust act of this State, enacted in 1891. (Ill. State Bar Stat. 1935, p. 1235; Smith's Stat. 1935, p. 1201.) It is manifest that when the General Assembly enacted the Fair Trade act in 1935 it was attempting to modify its former policy and to adopt an economic concept which has received widespread popular approval in recent years. The gist of the theory is that the manufacturer of a trade-marked article sold in competition with articles of similar nature, who has designated a fair price at which he, as well as his distributor and retailer, can make a fair profit, has a property right in the good will towards his product which he has created, and that it is sound public policy to protect that property right against destruction by others who have no interest in it except to employ it in a misleading manner for the purpose of deceiving the public. "The basic theory on which this concept rests," observed the California Supreme Court in *Max Factor & Co.* v. *Kunsman,* 55 Pac. (2d.) 177, "is that, from a social standpoint, price cutting, in the long run, adversely affects the public interest, and that the public will be adequately protected against excessive prices by the ordinary play of fair and honest competition between manufacturers of similar products." Section 2 of the California Fair Trade act, as does section 3 of our law, prohibits manufacturers from contracting between themselves to fix re-sale prices.

To the extent that the Fair Trade act effects a change in the economic public policy of this State we have no power to interfere. It is wholly immaterial whether the individual members of this court agree with the economic and social philosophy upon which the Fair Trade act is established, and no duty rests upon us to pass upon the wisdom of the economic public policy which it declares. That function is wholly legislative. It is not a judicial function to lecture either the public or business. Neither is

it within the province of 'a court to philosophize concerning economic conditions. In passing, however, we cannot help but note that many of the present legislative enactments, such as the Fair Trade acts of New York, California and Illinois, are resultants brought about because of the failure of the public, and particularly the business public, to observe those ethical principles which lie at the very foundation of fair dealing and business honesty. The shady efforts made by some to obtain an unfair advantage over others are not compatible with good citizenship nor in keeping with the best traditions of the law merchant as known at the common law. If public opinion cannot check these practices then business can expect legislatures to attempt to remedy them.

The Fair Trade act is intended to curb one of these practices by protecting the manufacturer who has built up a brand or article based on quality and excellence and preventing its use as a "loss leader" by those who would sell it for the purpose only of inveigling the public into patronizing their places of business, in the hope of obtaining a profit on other goods of inferior quality. In other words, the reputation of the one is used for the personal advantage of the other. The legislative determination of whether this statute is a proper exercise of the police power, however, is not necessarily conclusive. Whether the means employed have any real, substantial relation to the public health, comfort, safety or welfare, or are essentially arbitrary and unreasonable, is a question which is subject to review by the courts. *People* v. *Belcastro,* 356 Ill. 144; *People* v. *Rosehill Cemetery Co.* 334 id. 555; *Condon* v. *Village of Forest Park,* 278 id. 218; *People* v. *Steele,* 231 id. 340.

The defendant maintains that section 2 of the Fair Trade act arbitrarily deprives him of his right to determine the price at which he will sell his commodities, and, in consequence, violates the due process clauses of the Federal and State constitutions. The right asserted is not un-

fettered, and is, of course, subject to the legitimate exercise of the police power. Although we find that only two courts of last resort have passed upon the validity of Fair Trade acts such as the one in controversy, an analogous statute was held constitutional nearly twenty years ago—*Ingersoll & Bro.* v. *Hahne & Co.* 88 N. J. Eq. 222, 101 Atl. 1030. A statute of the State of New Jersey enacted in 1916 declared it unlawful for any merchant, firm or corporation to appropriate for his or their own use a name, brand, trade-mark, reputation or good will of any maker in whose product they dealt, or to discriminate against it by depreciating the value of the product in the public mind by misrepresentation as to value or quality or by price inducement, except where the goods did not carry a notice prohibiting such practice. The factual situation disclosed that the complainant, a manufacturer of watches, sold under the Ingersoll name, among others, a watch known as the "Yankee Watch." This product was advertised throughout the United States to be sold to the consumer at $1.35. The complainant charged that the only method by which the watches could be sold for this low price was to manufacture them in immense quantities, and that the only way to obtain customers upon a large scale was by extensive advertising; that the name "Ingersoll" and the reputation of the firm for fair dealing and reliable products were nation wide; that it was absolutely necessary, as a part of the advertising and building up of the business, that a definite fixed price should form a part of the advertising for each of the products, and that all the Ingersoll watches were sold subject to a notice forbidding the retailer to dispose of them for less than a price fixed by the manufacturer. A jobber in New York disposed of the watches to a New Jersey retailer who sold them for less than the standard price. Upon the facts presented the statute was held valid. The vice-chancellor in his opinion said: "Complainant has no monopoly. Its goods are not

manufactured under patents. It is constantly in competition with manufacturers of cheap watches. Not only is it morally bound as a result of its advertising to guarantee its product, but it, in fact, guarantees it in writing. The defendant makes use of the name, reputation, and guaranty of complainant for its own ulterior purpose and appropriates to itself the effect of the extensive advertising, upon which the complainant depends, for defendant's own profit, in violation of the contract expressed in the notice, and with no desire to benefit the public. A retailer does not sell a standard article at a loss for eleemosynary purposes." The injunction granted the complainant was subsequently made permanent in *Ingersoll & Bro.* v. *Hahne & Co.* 89 N. J. Eq. 332, 108 Atl. 128. The same jurist in this later case pointed out that, even in the absence of statute, contracts relating to trade and containing restraints are valid if such restraints are reasonable. In particular, the court said: "It is also well recognized that a person has a property interest in his trade-name and good will, and will, even in the absence of statute, be protected against injury to that trade-name and good will. This right has in this State been as above indicated recognized by statute. * * * In those cases in which the right to fix a re-sale price has been under consideration, the prohibition against the re-sale has been against the re-sale of the article itself. The name or trade-mark or what not has been so much an integral part of the article as that a re-sale of the article without reference to the trade-mark or trade-name would be practically impossible. In the case at bar the prohibition is not against a re-sale of the article, nor is it impracticable to re-sell the article without reference to the trade-name. * * * Complainant does not seek to retain any right in the article itself; it merely seeks to restrain the use of its trade-name and good will, except under conditions fixed by it. It may permit the purchaser of the article to use its trade-name and good will under

such conditions as it sees fit. * * * It seems to me that there is a clear distinction between those cases in which the nature of the restraint is such as necessarily to affect the re-sale of the article itself and the case at bar where the nature of the restraint is not such."

The contention was made in the celebrated case of *Nebbia* v. *New York,* 291 U. S. 502, that because the Milk-control law of New York essayed to control prices it denied due process. The Supreme Court of the United States, in answering this contention, said: "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the State is incapable of directly controlling the price itself. This view was negatived many years ago.—*Munn* v. *Illinois,* 94 U. S. 113." The court reviewed numerous decisions (*German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, *Griffith* v. *Connecticut,* 218 id. 563, *O'Gorman & Young* v. *Hartford Fire Ins. Co.* 282 id. 251, *Frisbie* v. *United States,* 157 id. 160, *Yeiser* v. *Dysart,* 267 id. 540, *Cotting* v. *Kansas City Stockyards Co.* 183 id. 79, and *Stephenson* v. *Binford,* 287 id. 251,) showing that the private character of a business does not necessarily remove it from the realm of regulation of charges or prices. The court then observed: "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the fifth and fourteenth amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. (*Wolff Packing Co.* v. *Industrial Court,* 262 U. S. 522, 535.) The phrase 'affected with a public inter-

est' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the State may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells."

The defendant, however, invokes *Doubleday, Doran & Co.* v. *Macy & Co.* 269 N. Y. 272, 199 N. E. 409, in which section 2 of the New York Fair Trade act, identical with the same section of our statute assailed in the present case, was held unconstitutional as applied to the facts set forth in the complaint. The articles in question were books. The Doubleday books are not "commodities" within the accepted meaning of the term. Each book rests upon its own merit, and outside of the binding and paper content it bears no similarity to the intent of the term used in the act, namely, commodities. A general statute such as the Fair Trade act may, of course, be invalid when applied to one set of facts and clearly valid when applied to other fact situations. (*Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282.) The court in *Max Factor & Co.* v. *Kunsman, supra,* distinguished the *Doubleday, Doran & Co.* decision and held it inapplicable to the facts presented in the California case. The court said: "The plaintiffs in the New York case were Doubleday, Doran & Co. Inc., publishers, and Doubleday Doran Book Shops, Inc., retailers. The contract men-

tioned in the decision is one between the publishing corporation and the retailing corporation. Aside from any inference to be drawn from the similarity of names, the opinion states that the two plaintiffs, in reality, were one and the same, for it refers to 'the price which they (the plaintiffs) stipulated as a retail price in a *contract between themselves.*' Other language indicates the book shop corporation is merely a subsidiary and agent of the publishing company. Again, the plaintiff publishers sold the books in question to the defendant without exacting or, in so far as appears, attempting to exact, from the buyer any restriction on the price for re-sale. In other words, the producer of goods placed a retail price upon its product by its own independent action, and voluntarily sold the goods to a retailer (Macy & Co.) for re-sale without seeking, or at least obtaining, any agreement by the retailer to observe any retail price. In the action, it seeks to prevent the retailer, to whom it has sold the goods without restrictions, from selling the goods at prices less than those which the producer saw fit to fix, in a contract between it and a subsidiary. The New York court accepts, for the purpose of the decision, the interpretation of the act as covering such situation, and, upon that assumption, and apparently that assumption alone, holds section 2 of the act to be unconstitutional. The plaintiffs in the New York case allege only a single contract purporting to fix the re-sale prices, and that in a pretended contract made with itself, far different from the factual set-up in the *Max Factor & Co. case.* Here there has been adopted a system of making written contracts, generally between producers and retail distributors, under which the products may and will be sold only to retailers who will re-sell at specified prices and have entered into contracts with the distributor to so sell such products. Practically all of the wholesale and retail druggists in California have executed such contracts, and are observing them, and the plaintiffs' distributors have re-

fused, and will refuse, to sell such products to wholesalers or retailers who do not enter into such contracts. A contract has been tendered to defendant for execution, but defendant will not enter into the agreement. The plaintiffs therefore decline to sell the commodities to defendant unless the defendant enters into the contract. The defendant, with full knowledge of the system of contracts, and the extent of the execution and compliance with their terms by the trade, has obtained Factor products 'unbeknown' to plaintiffs, and is selling them at prices less than the prices fixed by the contracts so extensively entered into by others. These facts serve to vitally differentiate the situation in New York from that here."

The defendant argues, however, that the Fair Trade act creates an arbitrary classification of persons and grants to such persons special privileges and immunities, in contravention of the constitutional guaranties invoked. He asserts that the vendors and vendees of commodities bearing the trade-mark, brand or name of the producer or owner may, under certain circumstances, fix the re-sale price thereof immune from the criminal penalties prescribed by the Anti-Trust act. The argument rests upon the assumption that there is no rational basis for denying to the vendors and vendees of commodities not bearing such trade-mark symbols the right to fix the re-sale price without incurring the penalties of the Anti-Trust act.

The first section of the fourteenth amendment to the Federal constitution declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The fourteenth amendment does not purport to prevent a State, however, from adjusting its legislation to differences in situation, and to that end to make a justifiable classification.

It merely requires that the classification shall be based on a real and substantial difference having a rational relation to the subject of the particular legislation. *Nebbia* v. *New York, supra; Power Manufacturing Co.* v. *Saunders,* 274 U. S. 490; *Lindsley* v. *Natural Carbonic Gas Co.* 220 id. 61; *Magoun* v. *Illinois Trust and Savings Bank,* 170 id. 283; *Michigan Millers Ins. Co.* v. *McDonough,* 358 Ill. 575; *Stewart* v. *Brady,* 300 id. 425.

Supplementing the equal protection provision of the fourteenth amendment, section 22 of article 4 of the constitution of this State prohibits the passage of a special law granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. The purpose of this provision is to prevent the enlargement of the rights of one or more persons and the impairment of or discrimination against the rights of others. To avoid falling within the constitutional inhibition of special legislation, the classification of subjects or objects must be based upon some reasonable and substantial difference in kind, situation or circumstance bearing a proper relation to the purposes to be attained by the statute. *Michigan Millers Ins. Co.* v. *McDonough, supra; Jones* v. *Chicago, Rock Island and Pacific Railway Co.* 231 Ill. 302.

The California Supreme Court, in passing upon the validity of the Fair Trade act of California, section 1½ of which corresponds to the Fair Trade act of our State, (*Max Factor & Co.* v. *Kunsman, supra,*) said: "Respondent also urges that the statute denies equal protection of the laws in that it applies only to articles sold under a trademark or trade or brand-name, and does not apply to non-trade-marked commodities, and, among trade-marked articles, applies only to those in free and open competition with others of a similar nature. As already pointed out, it is only in reference to those commodities included within the statute that the manufacturer or producer has a property right in the nature of good will, which, in the public in-

terest, should be protected. Such a classification is reasonable. The exclusion of trade-marked articles not in free and open competition with others of a similar nature is likewise reasonable. By that provision the public is protected from artificially high prices imposed by one with an exclusive market."

The Anti-Trust act expresses the public policy of the State against trusts and combinations organized for the purpose of suppressing competition and creating monopoly. (*Harding* v. *American Glucose Co.* 182 Ill. 551.) The Fair Trade act does not assume to permit restrictions on the price at which trade-marked commodities may be re-sold, irrespective of whether re-sold under the trade-mark. It permits restrictions to be placed on the *use* of trade-marks, names and brands—not restrictions on the price of commodities generally, except, as the plaintiff contends, to the extent that new commodities may become involved in an attempt to damage the good will built around a trade-mark, name or brand. The manifest legislative intent is the protection of the property interest in a mark, name or brand by preventing the use of the symbol by price-cutting retailers in ways likely to depreciate the property interest. Such competitors could also destroy a commodity built on merit by underselling, and thus destroying the purpose of the label intended to signify quality. As applied to the present case, by using the trade-name of a well known liquor the defendant, in effect, attracts the public to his store, and thereby induces the visitors to become the purchasers of other goods offered for sale. The defendant thus benefits at the expense of the trade-name "Old Quaker" by using the plaintiff's products as a means to draw trade. Price-cutting primarily injures the owner of a good will which has become identified with a trade-mark, brand or name, on a commodity competing.in the market with other goods of the same general class. On the other hand, the manufacturers and distributors of commodities which bear

no trade symbol obviously cannot have a good will which requires the protection afforded by the Fair Trade act.

The only re-sale price maintenance, if any, permitted by the Fair Trade act is vertical. Vertical price maintenance merely enables a producer, or his distributor, to set a price at which the trade-marked commodity shall be sold to the consumer. Section 1 specifically provides that a commodity, in order to be subject to the contracts permitted under the Fair Trade act, must be "in fair and open competition with commodities of the same general class produced by others." Section 3 declares that the act shall not apply to any contract or agreement between producers, or between wholesalers, or between retailers, as to sale or re-sale prices. In short, it does not apply to horizontal price maintenance. The statute clearly does not even tend to legalize trusts or monopolies. It does tend to prohibit trusts and monopolies. (*Ingersoll & Bro.* v. *Hahne & Co. supra; Fisher Flouring Mills Co.* v. *Swanson,* 76 Wash. 649, 137 Pac. 144.) Application of section 2 of the statute to the facts discloses that Old Quaker whisky is in competition with other whiskies of like grade being sold in the Chicago market. No restraint rests upon the defendant inhibiting him from dealing in the competing goods of other products of the same general class sold by the plaintiff. He can freely sell whisky at a lower price than the standard price for Old Quaker. The statute merely prevents him from filching the good will associated with the descriptive mark and name "Old Quaker" for his own ulterior purposes.

*Horwich* v. *Walker-Gordon Laboratory Co.* 205 Ill. 497, is cited, however, to support the defendant's position that the Fair Trade act violates the constitutional limitations against arbitrary classification. This court, in the case relied upon, held that the Trade-mark act of 1901 violated section 22 of article 4 of our constitution. Section 2 of the statute declared it illegal for any person, without the written consent of the owner, to sell certain receptacles

bearing the trade-mark, brand or name of the owner. Section 3 made the possession by any junk dealer of receptacles bearing registered trade-marks, *prima facie* evidence that such possession was unlawful. The fourth section prescribed criminal penalties for the violation of the provisions of the act. An action was brought under section 6, which provided that any person might be enjoined from violating the second section. The court pointed out that the purpose of the statute was to facilitate the recovery of the receptacles described in the first section which had passed from the possession of their owners to others and which the owners desired to recover summarily. On the other hand, the Fair Trade act of 1935 has for its major objective the preservation and protection of the property interest of the producer and his distributors in the good will represented by brands, trade-marks and trade-names. The law is also designed to protect the consumer's interests. The legislature by this act has attempted to benefit alike the producer, the distributor and the public. It is apparent that the objective of the Fair Trade act is not some purely personal goal, such as the summary recovery of certain types of personal property. The *Horwich case,* it is true, dealt with trade-marks, but solely in their character as indicia of ownership. In the present case the statute attacked deals not only with trade-marks in that respect, but also with the good will built up by a producer or distributor around a trade-mark, trade-name or brand, and provides that certain conduct with respect to the use of such trade-marks, names or brands constitutes unfair competition.

*Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 540, is also invoked to sustain the defendant's position. The Illinois Trust act of June 20, 1893, prohibited trusts or combinations in restraint of trade or competition. Section 9 excepted from the provisions of the act agricultural products or livestock while in the hands of the producer or raiser. Section 10 provided that the purchaser of any article or

commodity from such a trust or combination should not be liable for the price and might plead the act as a defense to any action therefor. Suit was brought to recover for the sale of sewer pipe and the statute was pleaded as a defense. The United States Supreme Court held that the discrimination created by the ninth section rendered the act repugnant to the provisions of the fourteenth amendment, respecting the equal protection of the laws.

The defendant argues that no distinction can be drawn between the classification condemned in the *Connolly case, supra,* and that provided by the Fair Trade act. The argument rests upon the premise that the Fair Trade act, in like manner as the Trust act of 1893, creates an unfair and arbitrary classification, in flagrant violation of the constitutional guaranty of equal protection of the laws. It is urged that the new law attempts to legalize business practices which have long been deemed illegal under the Anti-Trust act. The arguments are based upon erroneous premises and therefore must fall. The Anti-Trust act was never intended to interfere with the protection given to the good will established around the use of a trade-mark, brand or name. Obviously, it does not even purport to render illegal the conduct sanctioned by the Fair Trade act. Moreover, a retailer such as the defendant is not expressly prohibited from removing the trade symbol and selling the whisky which he owns, at whatever price he pleases. Manifestly, there can be no interference with the enforcement of the Anti-Trust law under such circumstances.

An insuperable objection to the validity of the Fair Trade act, the defendant insists, is that the provisions of the statute are so incomplete, vague, indefinite and uncertain that men of ordinary intelligence must necessarily guess at their meaning and differ as to their application. Statutes vulnerable to the objection stated have been declared unconstitutional as denying due process. (*Champlin Refining Co.* v. *Commission,* 286 U. S. 210; *Parks* v. *Libby-*

*Owens-Ford Glass Co.* 360 Ill. 130.) On the other hand, where the words assailed, taken in connection with the context, are commonly understood, their use does not render a statute invalid. (*People* v. *Huls,* 355 Ill. 412.) Furthermore, the legislature is not required to define words in common and daily use. (*People* v. *Lloyd,* 304 Ill. 23.) A statute is sufficiently certain if the words and phrases employed have a technical or other special meaning well enough known to enable those within their reach to correctly apply them. (*Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Omaechevarria* v. *Idaho,* 246 id. 343; *People* v. *Mueller,* 352 Ill. 124; *Amberson* v. *Amberson,* 349 id. 249; *Kowalczyk* v. *Swift & Co.* 329 id. 308.) In the light of these authorities the following words and expressions segregated and scrutinized by the defendant are not so ambiguous as to render the Fair Trade act void for uncertainty: "Articles of standard quality," employed only in the title; the phrase "in fair and open competition," in section 1; the words "any commodity," and the expression "any contract entered into pursuant to the provisions of section 1," in section 2.

The remaining contention which requires consideration is that section 2 of the Fair Trade act contravenes section 1 of article 4 of the constitution of this State, which provides that the legislative power shall be vested in the General Assembly. It is argued that section 2 delegates to such individuals as choose to avail themselves of the benefits of the statute the power to regulate the prices of commodities sold by others. The contention, and the argument supporting it, rest upon the unwarranted assumption that the Fair Trade act is primarily, and not incidentally, a price-fixing statute. In referring to the purpose of the California Fair Trade act the Supreme Court of that State said that the act did not merely prohibit price-cutting for the purpose of regulating prices, but also prohibited the practice in a legitimate legislative attempt to afford protection to the validly-

acquired rights of others. (*Max Factor & Co.* v. *Kunsman, supra.*) The Fair Trade act of this State does not even attempt to fix or delegate to others' the right to fix the price at which any commodity may be sold in the market. It is true, however, that re-sale price maintenance laws, such as the Fair Trade acts of California, New York and Illinois, constitute permissive or conditional legislation. Specifically, our statute does not contain any mandatory requirements, nor does it fix the prices which are to be imposed. No question of governmental price-fixing is, in consequence, involved. In other words, the law would remain wholly inefficacious unless the conditions which it prescribes are met. The plaintiff, for example, is not commanded to operate under it. Only in the event that manufacturers or distributors elect to avail themselves of its provisions does the statute come into actual operation. This does not mean that the act took effect upon the approval of any authority other than the legislative branch of our State government. (*Commonwealth* v. *Goldburg,* 167 Ky. 96, 180 S. W. 68.) When the Fair Trade act was passed by the General Assembly it was a complete statute, in no manner dependent for approval or disapproval by any person or group of persons. The defendant's contention that the statute unlawfully delegates legislative power is without merit.

Two objections interposed in the trial court, namely, that the Fair Trade act violates the constitutional provisions against legislation impairing the obligation of contracts, and that it constitutes an invalid attempt to regulate the sale of commodities in interstate commerce, have not been argued on this appeal. They do not, therefore, require consideration.

The decree of the trial court is right, and it will be affirmed.

*Decree affirmed.*