TRIGO HERMANOS, INC., ET AL., Plaintiffs and Appellees *v.* SOBRINO DE IZQUIERDO, INC., Defendant and Appellant.

No. 10215.   Argued December 6, 1950.—Decided April 24, 1951.

*Miranda Esteve* and *Martínez Alvarez, Jr.*, for appellant. *Mc-Connell & Valdés* for appellees.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

Upon petition by Trigo Hermanos Inc., and Benigno Trigo Orbeta, the District Court of San Juan issued a preliminary injunction against Sobrino de Izquierdo, Inc., the defendant, in which it set forth, briefly, the reasons for its issuance—Rule 65 (*d*) of the Rules of Civil Procedure—as follows:

"WHEREAS: It has been proved to the satisfaction of this Court that on January 14, 1948 the firm Pedro Domecq *S. A.* appointed Benigno Trigo Orbeta, the plaintiff herein, exclusive

licensed agent for the Island of Puerto Rico and that upon making said appointment it fixed the price of Domecq products for the territory covered by the agency.

"WHEREAS: It has been likewise proved to the satisfaction of this Court that Benigno Trigo Orbeta, the plaintiff herein, appointed Trigo Hermanos Inc., the other plaintiff herein, exclusive distributor of Domecq products for the territory covered by the agency.

"WHEREAS: It has been further proved to the satisfaction of the Court that Sobrino de Izquierdo Inc., defendant herein, has acquired from the distributor of Domecq products in New York City certain shipments of brandy *bearing a label different from the label authorized by Pedro Domecq S. A. for the territory of Puerto Rico, which shipments it has sold as a whole or in part at prices less than those established by the exclusive licensed agent of said products in the Island of Puerto Rico.*

"WHEREAS: Said commercial practice constitutes an act of unfair competition prohibited by § 3 of Act No. 147 of May 15, 1937 of the Legislative Assembly of Puerto Rico, entitled 'An Act to protect the owners or possessors of trade-marks, distributors of merchandise, and the public of Puerto Rico against unfair commercial practices in the distribution of articles of commerce of standard quality under registered trade-marks or quality standards and name; to authorize the inclusion of certain provisions in the contracts relative to the sale or resale of articles the object of commerce; to provide remedies, and for other purposes.

"WHEREFORE: The defendant Sobrino de Izquierdo, Inc., is hereby ordered to abstain from making any sale whatsoever of products of the firm Pedro Domecq *S. A. bearing a label different from that authorized for the sale of said products in Puerto Rico and at prices other than those authorized by the manufacturer and by its exclusive agent in said territories,* and to stop the sale of the aforesaid products until further order of this Court, lest he be accused of contempt.

"The petitioners must furnish a bond in favor of the defendant Sobrino de Izquierdo Inc., in the amount of $2,000 (two thousand dollars) which must be approved by this Court before the preliminary injunction hereby issued shall take effect." (Italics ours.)

The defendant moved for reconsideration and upon its motion being denied it appealed and urges in its brief that

the lower court erred in granting the restraining order; in admitting jurisdiction to grant same,[1] and in issuing the preliminary injunction, erroneously weighing the evidence.

█ The questions raised by the appellant in regard to the granting of the restraining order, even though they might have some merit, have become academic—*Southard & Co.* v. *Salinger*, 117 F. 2d 194—inasmuch as the restraining order expired, pursuant to Rule 65(*b*) of the Rules of Civil Procedure, 10 days after entry.. Besides, the defendant took no steps, in time, to modify the action of the court *a quo* regarding the restraining order which, by its own terms, expired January 3, 1949 and was later extended until January 7, 1949 on which date trial was held and at the close of which it was again extended until January 20. Notwithstanding that, it was not until June 27, 1949 that the preliminary injunction was issued, without the record disclosing that the restraining order was further extended at all. We shall now consider the third error assigned.

█ Issuance of the injunction sought is based chiefly in that appellant's action in selling in Puerto Rico a shipment of Domecq brandy which it purchased in New York at a price less than that fixed by the firm Pedro Domecq *S. A.* of Spain for said product in Puerto Rico, on the basis of the contract entered into with its agent Benigno Trigo Orbeta, constitutes a violation of the Fair Trade Act of Puerto Rico, namely, Act No. 147 of May 15, 1937, as amended by Act No. 265 of May 15, 1938.[2] To that effect, the lower court set forth among its findings of fact, the following:

---

[1] When the petition was filed, the court granted a restraining order upon the furnishing of a bond.

[2] Since said Act is fairly short, we copy it below:

"Section 1.—This Act shall be known as the *Fair Trade Act*.

"Section 2.— (As amended by Act No. 265 of 1938)—Contracts relative to the sale or resale of any product the object of commerce in Puerto Rico, the label or container of which shows the trade-mark, standard of quality or name of the producer or owner of such article, and which may be in competition with articles of a similar kind produced by others, can contain the following stipulations:

"That the contract between Benigno Trigo Orbeta and the Sociedad Pedro Domecq S. A. (plaintiffs' exhibit I), establishes that 'by virtue of the exclusiveness vested in him and in order to meet the debts and obligations mentioned in this contract, the Agent shall fix the selling price for importers pursuant to note No. 2 also attached hereto, such prices to be likewise understood F.O.B. Cádiz, without discount or commission; in the event that the firm shall increase or reduce its prices, the agent shall be obliged to increase or reduce his in the same proportion.' "

The appellant maintains that said finding is erroneous since the aforesaid contract was amended on the same date of execution eliminating therefrom precisely the matter which appears in quotation marks in said finding. The appellant is right, as we shall presently see.

The aforesaid contract (petitioners' exhibit I) was executed January 14, 1948 and recites:

"THE FIRM PEDRO DOMECQ S. A., of Jerez de la Frontera, and MR. BENIGNO TRIGO of San Juan, P. R., as of this date stipulate and agree as follows:

"*First:* The firm Pedro Domecq S. A. gives Benigno Trigo

---

"(1) That the purchaser shall not resell such product except at the minimum price stipulated by the vendor;

"(2) That the producer or original vendor is obliged to require, upon making any transaction with another purchaser in regard to said article, that the latter, in turn, binds himself not to sell the said article at a price less than that stipulated by the producer or original vendor;

"(3) That when the purchaser is compelled to liquidate his merchandise, he must offer the articles the object of the liquidation to other merchants engaged in the same branch, at least ten (10) days in advance of the date fixed for making said liquidation; and

"(4) That the Commissioner of Agriculture and Commerce shall have full power to arbitrate any controversy that may arise by reason of the provisions of this Act; and if the parties in controversy show themselves unwilling to submit their differences to the Commissioner of Agriculture and Commerce, he, on request of either party, shall have power to determine the action to be taken, according to the special circumstances of the case.

"The preceding provisions shall have no effect in the following cases:

"(*a*) When, because he needs to discontinue his business, the merchant or distributor is obliged to liquidate his merchandise, if, thirty (30) days in advance of said liquidation, he offers the products subject to liquidation to the manufacturers thereof.

"(*b*) When the articles are damaged, ·deteriorated, or defective as to

the exclusive franchise for the sale of its products in the entire territory of the Island of Puerto Rico and the Virgin Islands, under the title of EXCLUSIVE LICENSED AGENT.

"*Second:* The Agent binds himself not to represent or sell any product similar to those of the Firm, and to further actively the development and promotion of the sale of the aforesaid products in his territory.

"*Third:* The Agent shall sell exclusively to Commercial Wholesale Importers and for direct importation consigned to the purchaser.

"*Fourth: The price of the Products of the Firm shall be as listed in Note No. 1 attached to this Contract, or those quoted by the Firm, such prices to be understood F.O.B. Cádiz without any discount or bonus whatsoever.*

"*Fifth: By virtue of the exclusiveness vested in him and in order to meet the debts and obligations mentioned in this contract, the Agent shall fix the selling price for importers pursuant to Note No. 2 also attached hereto, such prices to be likewise understood F.O.B. Cádiz, without discount or commission. In the event that the Firm shall increase or reduce its prices the Agent shall be obliged to increase or reduce his in the same proportion.*

---

quality, in which case he shall publish a notice in which the condition of the articles so damaged, deteriorated, or defective is stated, which notice he shall publish three times within the period of ten (10) days in one of the newspapers having the largest circulation in the Island of Puerto Rico;

"(c) When it is so prescribed by judgment, decree, or order of a court of competent jurisdiction.

"Section 3.—Every person or firm knowingly and wilfully advertising or offering for sale or selling any article of commerce at a price lower than that stipulated in a contract executed in accordance with the provisions of the preceding Section 2, even though the person who so advertises, offers, or sells is or is not an interested party to said contract, shall be considered as being guilty of unfair competition and shall be liable in an action for damages; and if the case is decided in favor of the claimant, the court shall determine the amount of the indemnity to which he is entitled.

"Section 4.—This Act shall not be applicable to any contract or agreement made by producers among themselves or by wholesale vendors among themselves, or retail dealers among themselves, in so far as it refers to resale prices.

"Section 5.—If any clause, paragraph, section, article, or part of this Act is declared unconstitutional by a court of competent jurisdiction, said judgment shall not affect or invalidate the other provisions of this Act, but its effect shall be limited to the clause, paragraph, section, article, or part of this Act so declared."

*"Sixth:* The sales contracts executed between the Agent and the Importer shall be sent to the Firm for fulfilment, it being understood that they shall always be subject to final acceptance by the latter.

*"Seventh: The only manner of payment which the Agent may accept* in the sale contract is irrevocable Credit in favor of the Firm on a Spanish Bank for the value of the order *at the prices fixed by the Firm with a prudential increase to cover consular and all kinds of fees which might originate in the shipment.* This credit will be collectible against delivery of the bills of lading. The Firm shall draw up the invoices in the name of the Importer and for a principal value calculated at the prices fixed by the sales contract.

*"Eight:* In consideration of the exclusive franchise which the Firm gives to the Agent, the latter binds himself to undertake all the publicity, propaganda and advertisement necessary for adequate sale development and promotion; to pay the salaries or commissions of subagents and salesmen; and all those charges which might originate from claims, damages, or unforeseen expenses and which in the absence of this Contract the Firm would have to pay in order to protect its business and good will.

*"Ninth:* The duration of this Contract is three years from the date it is subscribed, and upon expiration it shall be considered extended for a like term, provided no notice to the contrary has been given by either party six months prior to the date of expiration.

*"Tenth:* This contract shall be constituted a public deed whenever required by either of the two contracting parties.

*"Eleventh:* This contract annuls all previous Contracts and Agreements." (Italics ours.)

On that same date, January 14, 1948, said contract was modified (annex of petitioners' exhibit I) as follows:

"Pursuant to our conversations *we agree to modify the Contract in force* between us in the following manner:

*"Fourth:* The price of the products of the Firm shall be as listed in the note attached to this letter, or those subsequently quoted by the Firm, such prices being understood F.O.B. Cádiz, net without discount.

"*Fifth: As compensation for his services the Agent shall receive 7½ per cent on the full invoice value on all successful sales in his territory.*

"*Seventh:* Payment shall be by irrevocable credit for 80 per cent of the invoice value plus all consular and all other fees appearing therefrom. The Agent assumes responsibility for the collection of the remaining 20 per cent of which he shall apply the proper amount to his commission and to the propaganda expenses mentioned in the Eighth clause, retaining the balance at the disposal of the Firm.

"*Eighth:* The Agent is authorized to invest in the propaganda and advertisement of the products of the Firm, five per cent of the full invoice value, and he must account for these investments at the request of the Firm. The Agent on his part binds himself to invest on his own account in advertisement and propaganda of the brands of the Firm, a sum equal to that given him by the Firm, for which investment he shall also account.

"*Tenth:* This clause is annulled.

"The clauses not mentioned in this letter remain in full force."
(Italics ours.)

As may be seen, the terms of the contract as amended are quite different from those of the original contract, especially the fifth and seventh clauses. While in the former, after fixing the price at which the Domecq firm sold its products to the agent pursuant to Note No. 1 (fourth clause), the agent Benigno Trigo Orbeta was authorized by the fifth clause to fix the selling price for importers pursuant to Note No. 2; and the seventh clause established the manner of payment "at the prices fixed by the Firm," after the contract was amended, the fifth clause did in no way authorize the agent Benigno Trigo Orbeta to fix prices for resale in Puerto Rico. Nor does said contract contain any stipulation to the effect that the purchaser, Trigo Hermanos, Inc., would not resell the Domecq products except at the prices stipulated by the seller, nor that the producer or original vendor, the Domecq firm, is bound to demand, upon making any transaction with another buyer, whether Trigo Hermanos, Inc., or any other wholesaler in connection with said commodities, that the latter in

turn bind themselves not to resell said articles at a price less than that stipulated by the producer or original vendor as required by paragraphs 1 and 2 of § 2 of the Fair Trade Act, *supra*. Under all these circumstances, the contract between the Domecq firm and Benigno Trigo Orbeta can not be considered as falling under and protected by the provisions of the aforesaid Act. The fact that Benigno Trigo Orbeta testified that he fixed the price at which Trigo Hermanos Inc., as wholesale distributors, could resell, did not establish either that said prices were the prices stipulated by the original vendor. And of course, there is nothing in the contract tending at least to fix the prices at which Domecq products should be sold by the retailers.

Fair Trade Acts have been approved in at least forty-four of the continental States,[3] and ours, in general terms, is similar to the Acts of California and Illinois. These Acts constitute an exception to the Acts prohibiting monopolies and monopolistic practices,[4] and even in the federal system the Miller Tydings Act of 1937, 15 U.S.C.A. 1, which amended the Sherman Act against monopolies, eliminated contracts prescribing prices for commodities bearing trademarks from the prohibitions of the Sherman Act and declared that it did not constitute an unfair method of competition with articles of the same general class, provided that such contracts are lawful in the place where resale is made. Prior to the approval of the Miller Tydings Act, the Supreme Court of the United States in *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U. S. 373, held that a contract by virtue of which the producer or manufacturer fixed the price at which its wholesale or retail purchasers might sell its products, amounted to a contract in restraint of trade and was invalid both at common law and so far as it affected interstate commerce also

---

[3] This is set forth in the Annotations on these Acts contained in 125 A.L.R. 1335 and in 86 L. Ed. 1421.

[4] Act to protect trade and commerce against unlawful restraints and monopolies of March 14, 1907. Sess. Laws of 1907, p. 328.

under the Sherman Act. Justice Holmes wrote a vigorous dissenting opinion in said case [5] in which, since the conclusion of the majority rested mainly on the absence of an Act authorizing price maintenance in these cases, he said:

"But I go farther. There is no statute covering the case; there is no body of precedent that by ineluctable logic requires the conclusion to which the court has come. The conclusion is reached by extending a certain conception of public policy to a new sphere. On such matters we are in perilous country. I think that, at least, it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear . . . ."

As soon as the Supreme Court of the United States had under consideration a case in which it had to construe a Fair Trade Act, it changed the views expressed in the case of Dr. Miles Medical Co. It was in *Old Dearborn Co.* v. *Seagram Corp.*, 299 U. S. 183 that, construing the Fair Trade Act of Illinois and after citing from the case of Dr. Miles Medical Co. the references made therein to the absence of legislation, it was said at page 191: "While these observations of the court cannot, of course, be regarded as decisive of the question, they plainly imply that the court at the time foresaw no valid constitutional objection to such legislation, for it cannot be supposed that the court would suggest a legislative remedy the validity of which might seem open to doubt." The court then proceeded to consider the case under the Fair Trade Act of Illinois and decided that the same was valid, thus ratifying innumerable State decisions which had already upheld the validity of these acts.[6] However, since such legislation and the contracts authorized thereunder constitute an exception to the acts forbidding monopolies and unfair

---

[5] In commenting on said opinion, Sir Frederick Pollock, in a letter dated May 3, 1911 addressed to Justice Holmes, said in part: "Either your dissenting opinion in the *Miles Medical Co.'s* case is right or much of our recent authority here is wrong. . . ." 1 Holmes-Pollock Letters 178.

[6] See the annotations cited in footnote 3. The constitutionality of the Miller Tydings Act was upheld by a majority, in *Schewgmann Brothers* v.

trade practices, their provisions must be strictly construed. *Mennen Co.* v. *Krauss Co.*, 37 F. Supp. 161 (D.C. La., 1941); *Bathasweet Corporation* v. *Weissbard*, 15 A. 2d 337 (N. J., 1940); *Pazen* v. *Silver Rod Stores*, 22 A. 2d 237 (N. J., 1941); *Rayess* v. *Lane Drug Co.*, 35 N. E. 2d 447 (Ohio, 1941) and 52 Am. Jur. 650, §180. But, of course, judicial construction must not be so strict as to destroy the purpose of the Act. *Calvert Distilling Corp.* v. *Nussbaum Liquor Store*, 2 N.Y.S. 2d 320 (N. Y., 1938).

". . . The primary aim of the law is to protect the property—namely, the good will—of the producer, which he still owns. . . ." *Old Dearborn Co.* v. *Seagram Corp., supra*, p. 193. And in fact, the fixing of sale and resale prices of the product in a vertical fashion, namely, from the producer to the distributor to the retailer, is an essential requisite of the contract since the Act itself, in its § 4, *supra*, prohibits any contract or agreement made in a horizontal fashion, that is, by producers among themselves, by wholesale vendors among themselves, or by retail dealers among themselves. As we have said, the evidence herein showed that although the Domecq firm fixed the prices at which its agent Benigno Trigo Orbeta could sell its products to wholesale importers and for direct importation consigned to the purchaser, it did not fix in any manner whatsoever the price at which said wholesalers should resell them nor the price at which, in the last resort, they would be sold at retail. An actual fixing of prices in a vertical fashion as required by the law and the decisions did not exist. *Joseph Triner Corporation* v. *McNeil*, 2 N. E. 2d 929, *cf.* in 299 U. S. 183; *Ely Lilly & Co.* v. *Saunders*, 4 S. E. 2d 528 (N. C., 1939); Annotation, 125 A.L.R. 1335 *et seq.* In other words, the contract under consideration fixes the

*Calvert Distillers Corp.*, 184 F. 2d 11 (C. A. 5, 1950). The Supreme Court granted certiorari in said case and the same was argued in said court last week. 19 Law Weekly 3275. The validity of the Federal Act is challenged insofar as it may render the Fair Trade Act applicable to persons who have not taken any part in the execution of contracts authorized under the latter.

price at which wholesalers may *purchase* from the Domecq firm but it does not fix prices for resale and the latter is, precisely, what the Fair Trade Act tries to protect, namely, the resale price of those commodities which bear recognized trade-marks competing with other similar articles. It has been the trade-mark, the good will it represents, what Fair Trade Acts have intended to protect, and not the product itself. It was even said in *Old Dearborn Co.* v. *Seagram Corp., supra,* p. 195, that there is nothing in the Act to preclude the purchaser from removing the label containing the trade-mark, "thus separating the physical property, which he owns, from the good will, which is the property of another —and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end."

In our judgment the lower court erred in issuing the preliminary injunction on the basis that the appellant had violated the provisions of the Fair Trade Act.

■■ The second ground on which the court rested to issue said writ was that the appellant was using in the sale of Domecq products a label different from that authorized by the producer for the sale of said products in Puerto Rico.

The court *a quo* stated that the sale in Puerto Rico by the appellant of certain shipments of Domecq brandy acquired by it from the distributor thereof in New York, with a label different from that authorized by Pedro Domecq *S. A.* for the territory of Puerto Rico, at prices other than those stated, is an act of unfair competition prohibited by § 3 of the Fair Trade Act, *supra.* The question regarding prices aside, there is nothing in § 3 providing that selling a commodity with a different, but genuine label [7] which bears a determined trade-

[7] It is an admitted fact that the label used in the Domecq products sold in New York is the label authorized by the producer and the contents of the bottles thus labeled is genuine Domecq brandy.

mark, is unfair competition. What said Section prohibits is the selling at a price lower than that stipulated in a contract executed pursuant to § 2.

This notwithstanding, injunction is the proper remedy if the facts warrant it, to protect the property right over a registered trade-mark [8] whenever a person usurps or infringes said trade-mark by using a similar one in a different product and thus establishing an unfair competition—*Sucrs. de J. Fernández, S. en C.* v. *Domenech, Treas.*, 60 P.R.R. 883—but we have decided that a partnership which is merely the general agent of the manufacturer of a product, the owner of the trade-mark, for the introduction and sale of said product in Puerto Rico, is not entitled to the remedy of injunction to restrain the use thereof. *Font & Co.* v. *López Bros.*, 36 P.R.R. 233.

We have before us the bottles of Domecq brandy offered and admitted in evidence in this case and, indeed, the large label affixed to the bottle of Domecq brandy distributed by Trigo Hermanos, Inc., in Puerto Rico, according to a small label affixed to the neck of the bottle, and the large label of the bottle of Domecq brandy bought by the appellant from the distributor of said product in New York, if not identical, are so similar that it can not be said that a person of ordinary intelligence may be misled in purchasing either bottle of said liquor. *Cf. Fonalledas* v. *Las Monjas Dairy Corp.*, 63 P.R.R. 83. Once the genuineness of the Domecq brandy contained in both bottles is admitted, we can not agree with the

---

[8] The evidence showed that the label containing the trade-mark of the Domecq brandy sold in Puerto Rico is duly registered and approved by the Federal Alcohol Administration, by the Bureau of Alcoholic Beverages of the Treasury Department of Puerto Rico and by the Federal Bureau of Customs, the latter stating that the owner of the trade-mark Pedro Domecq S. A. of Jerez de la Frontera, España, has consented to the importation of products bearing its trade-mark by Trigo Hermanos, Inc. It was not shown that said trade-mark was registered in the office of the Executive Secretary of Puerto Rico under Act No. 66 of July 28, 1923 to authorize the registration of trademarks used in the commerce of Puerto Rico and to protect the same.

lower court that the labels of said bottles are so different that the sale in Puerto Rico of the Domecq brandy purchased in New York might prejudice the appellees by establishing an unfair competition with the Domecq brandy sold by them in Puerto Rico. Both labels are worded in English and the main difference between them is that the New York label, on its top margin, to the center, reads: "Pedro Domecq," said name having on each side some musical notes and reading underneath: "In Tune with your Taste", which inscription is not found on the label of the brandy distributed by the appellees. Instead, the latter has an inscription which reads: "It has always been the policy of Pedro Domecq's firm since its establishment in 1730 to maintain their quality at the highest standard." Aside from this, both labels contain substantially the same inscriptions, designs, and an embossed seal, which we suppose is of the Domecq Firm.

It is in the insular Internal Revenue stamp, in the neck and across the stopper of the bottle of the Domecq brandy purchased by the appellant in New York that the following has been rubber-stamped: "Sobrino de Izquierdo, Inc., General Agents, San Juan, P. R.", and it is mainly this additional fact which the appellees assign as constituting a deceit prejudicial to their interest and an unfair competition. We doubt not that such action by the appellant would be sufficient to decree the injunction sought here. *Joseph S. Baum Mercantile Co.* v. *Levin*, 174 S. W. 442 (Mo., 1915); *Twin City Brief Printing Co.* v. *Review Pub. Co.*, 166 N. W. 413 (Minn., 1918); cf. *Heirs of González* v. *Roque González & Co.*, 33 P.R.R. 540. However, according to the testimony of Enrique Trigo Orbeta, appellant's witness,[9] not contradicted by the appellees, it was shown that immediately after the pretrial conference, the appellant proceeded to eliminate from the Internal Revenue stamps on all the bottles of brandy purchased by it, the inscription contained in the rubber stamp

---

[9] Transcript of Evidence, pp. 165–166.

to the effect that Sobrino de Izquierdo, Inc., are General Agents of Domecq products .in Puerto Rico. The general rule is to the effect that an injunction must be granted or denied on the basis of the facts and circumstances existing at the date of the hearing of the action. *Las Monjas Racing Corp.* v. *Insular Racing Comm.*, 57 P.R.R. 516; *United Brotherhood, etc.* v. *United States Tile, etc.*, 29 A. 2d 839 (C. A. Md., 1943); *Rosenthal* v. *Shepard Broadcasting Service*, 12 N. E. 2d 819 (Mass., 1938); *American Fruit Growers* v. *Parker*, 140 P. 2d 23 (Cal., 1943); *Levine* v. *Black*, 44 N. E. 2d 774 (Mass., 1942) and *cf. Reyes* v. *Las Monjas Racing Corp. et al.*, 40 P.R.R. 874.

We see, therefore, that if it can not be said that the labels of the Domecq brandy used by the producer, both for the liquors distributed in New York as well as for those distributed in Puerto Rico, are so essentially different that the sale of the former in Puerto Rico by the appellant may constitute an unfair competition with those sold by the appellees, and since it was proved that the appellant does not intend to pass as general agent of the Domecq firm in Puerto Rico, to the prejudice of the appellees, the preliminary injunction in the instant case should not have been granted on said grounds either.

The order appealed from will be reversed.

Mr. Justice Snyder concurs in the result of the opinion.