## SHAKESPEARE COMPANY *v.* LIPPMAN'S TOOL SHOP SPORTING GOODS COMPANY.

1. Trade-Marks and Trade Names—Statutes—Fair-Trade Agreements—Nonsigners.

State statute declaring that advertising, offering for sale or selling of a commodity which bears the trade-mark, brand, or name of the producer or owner and which is in fair and open competition with commodities of the same general class at a price that is less than that set by the producer or vendor is unfair competition and actionable at the suit of any person damaged thereby is unconstitutional as applied to persons who have not signed a so-called fair-trade agreement whereby they agree to abide by the producer's minimum prices on the products, since it constitutes a deprivation of property without due process of law (Const 1908, art 2, § 16; CL 1948, § 445.151 *et seq.*).

2. Same—Function.

Trade-marks and brand names, together with the good will attendant thereon, are protected in certain respects by act of Congress the function of a trade-mark being to designate the goods as the product of a particular manufacturer or trader and to protect his good will against the sale of another's product as his; to prevent confusion of the public regarding the origin of goods of competing vendors (15 USCA, § 1051 *et seq.*).

3. Constitutional Law—Fair-Trade Agreements—Monopoly.

Whether price-fixing arrangement is vertical or horizontal, important as bearing on question of whether a monopoly, trust or restraint of trade exists, is of no consequence in determining whether fair-trade statute bears any reasonable relation to public health, safety, morals or the general welfare (CL 1948, § 445.151 *et seq.*).

References for Points in Headnotes

[1, 4, 5, 7] 52 Am Jur, Trademarks, Tradenames, and Trade Practices § 177.
[1, 4, 5, 7] Right of manufacturer, producer, or wholesaler to control resale price. 125 ALR 1335.
[1, 4, 5,7] Comment Note.—Application of State "fair trade" law to nonsigning reseller as violation of Federal anti-trust laws. 19 ALR2d 1139.
[2] 52 Am Jur, Trademarks, Tradenames, and Trade Practices §§ 2, 3.
[6] 36 Am Jur, Monopolies, Combinations, and Restaint of Trade § 28.

4. Trade-Marks and Trade Names—Fair-Trade Agreements—Cut-Rate Sales.

Trade-mark rights of trade-mark owner are not breached by sale of commodity at less than price set by owner, where sold by party who had not signed so-called fair-trade agreement to sell at price set by manufacturer (CL 1948, § 445.151 et seq.).

5. Same—Business Affected With Public Interest—Price-Fixing—Good Will.

The business of manufacturing and selling trade-marked fishing tackle is not affected with a public interest, hence the State legislature may not interfere with the right of a party to fix the price at which the owner of such property may sell it merely to protect the good will of the manufacturer.

6. Same — Price-Fixing Agreements — Interstate Commerce — Signers.

Price-fixing agreements involving or affecting interstate commerce applicable to signers thereof are legal, where permitted under local law (26 Stat 209; 50 Stat 693; CL 1948, § 445.151 et seq.).

7. Same—Price-Fixing Agreements—Interstate Commerce—Non-signers.

Price-fixing agreements involving or affecting interstate commerce do not restrain nonsigners from cut-rate sales even when such agreements are permitted by local law (26 Stat 209; 50 Stat 693; CL 1948, § 445.151 et seq.).

Appeal from Wayne; Murphy (George B.), J. Submitted October 12, 1951. (Docket No. 81, Calendar No. 45,272.) Decided June 27, 1952.

Bill by Shakespeare Company, a Michigan corporation, against Lippman's Tool Shop Sporting Goods Company, a Michigan corporation, to restrain selling articles at lesser amount than required by fair trade agreement. Bill dismissed. Plaintiff appeals. Affirmed.

*Watson, Lott & Wunsch,* for plaintiff.

*Schmier & Schmier* (*John Sklar,* of counsel), for defendant.

Dethmers, J.   Plaintiff is a Michigan corporation, manufacturing in Michigan a line of fishing tackle and related equipment. Its products bear its trademark, brand or name. It advertises and sells its products, both in Michigan and nationally, through ordinary distributor, dealer and retail channels in fair and open competition with commodities of the same general class produced by others. Its products are sold and distributed in Michigan by about 500 dealers of whom over 400 have entered into written, so-called fair-trade agreements with plaintiff, pursuant to PA 1937, No 50 (CL 1948, § 445.151 *et seq.* [Stat Ann 1951 Cum Supp § 19.321 *et seq.*]), under and in accord with which it has established minimum prices on its products. Plaintiff has such contracts with dealers and has similarly fixed minimum prices in other States under comparable fair-trade laws there in effect.

Defendant is a sporting goods retailer in Detroit. It has not entered into a fair-trade agreement with plaintiff. It willfully and knowingly advertises, offers for sale and sells plaintiff's branded and trademarked articles at prices below the minimum fair-trade prices known by it to have been fixed thereon by plaintiff. This course of conduct plaintiff seeks to enjoin.

While admitting that it has made such sales, defendant claims that, because it is a nonsigner of a fair-trade agreement, as applied to the facts of this case, enforcement of the act against it would be violative of its rights under the equal protection and due process clauses of the Federal* and the due process clause of the State Constitutions† and, further, that the transactions in question were in or affected interstate commerce and, for that reason, subject only to Federal and not to State regulation,

---

\* US Const, Am 14, § 1.—Reporter.
† Mich Const (1908), art 2, § 16.—Reporter.

so that the attempted price fixing by plaintiff violated the Sherman anti-trust law. Plaintiff appeals from an order dismissing its bill of complaint.

The trial court, desiring, as it stated, to dispose of the case solely on what it terms "the broader grounds" of constitutionality under the provisions of the State Constitution, treated the transactions involved, for the purpose of the motion before it, as being exclusively in intrastate as distinguished from interstate commerce. Recognizing that the constitutionality of similar legislation, as applied to signers and nonsigners of fair trade agreements alike, had been upheld in most of the States considering the question, *e.g., Bourjois Sales Corp.* v. *Dorfman,* 273 NY 167 (7 NE2d 30, 110 ALR 1411); *Max Factor & Co.* v. *Kunsman,* 5 Cal2d 446 (55 P2d 177); *Joseph Triner Corp.* v. *McNeil,* 363 Ill 559 (2 NE2d 929, 104 ALR 1435); *Ely Lilly & Co.* v. *Saunders,* 216 NC 163 (4 SE2d 528, 125 ALR 1308); *Weco Products Co.* v. *Reed Drug Co.,* 225 Wis 474 (274 NW 426); *Goldsmith* v. *Mead Johnson & Co.,* 176 Md 682 (7 A2d 176, 125 ALR 1339); *Johnson & Johnson* v. *Weissbard,* 121 NJ Eq 585 (191 A 873); and by the United States supreme court in *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.,* 299 US 183 (57 S Ct 139, 81 L ed 109, 106 ALR 1476), the trial court, nevertheless, considered, as do we, that the better reasoned view is that of the Florida supreme court in *Liquor Store, Inc.,* v. *Continental Distilling Corp.,* 40 So2d 371, holding an act of that character unconstitutional. As applied to nonsigners of fair-trade agreements that is the only view consistent with our reasoning in *People* v. *Victor,* 287 Mich 506 (124 ALR 316). We there held a statute forbidding the giving of a premium with the retail sale of gasoline unconstitutional under Constitution 1908, art 2, § 16, as constituting a deprivation of property without due process of law for the reason that the legisla-

tion was outside the scope of the police power of the State inasmuch as it bore no reasonable relation to public morals, health, safety or the general welfare. Whether the statute prohibits, despite the absence of any contractual inhibition, the giving of such premium with a retail sale or prohibits the sale, by a nonsigner, of an article below the price fixed by the manufacturer is of small moment. The principle involved and the effect are the same. It is urged, however, that the instant case is distinguishable from the *Victor Case* in that it involves not alone the sale by defendant of an article owned by it, but as well "the wrongful appropriation of a person's property, to-wit, his good will and the recognized value of his trademarks and established brand names." This is followed by the suggestion that laws prohibiting theft, larceny or conversion do bear a relation to public morals and welfare and that, by the same token, so does the act in question. But is plaintiff's good will, trade-mark or brand name wrongfully appropriated or stolen by defendant by means of its cut-rate retail sales? It may be that they are adversely affected thereby as, indeed, they would be by a competitor's placing a better product on the market for less money. Does such adverse effect in and of itself constitute a violation of plaintiff's rights or a wrongful appropriation of its good will? We think not. Trade-marks and brand names, together with the good will attendant thereon, are protected in certain respects by act of Congress. 15 USCA, § 1051 *et seq*. The function of a trade-mark is simply to designate the goods as the product of a particular manufacturer or trader and to protect his good will against the sale of another's product as his; to prevent confusion of the public regarding the origin of goods of competing vendors. It was for that purpose that the law created a protective shield around trade-marks, brand names and the

good will connected therewith. See *Kroll Bros. Co. v. Rolls-Royce, Ltd.*, 126 F2d 495; *Smith v. Dental Products Co., Inc.*, 140 F2d 140, certiorari denied, 322 US 743 (64 S Ct 1146, 88 L ed 1576); *Hanover Star Milling Co. v. Metcalf*, 240 US 403 (36 S Ct 357, 60 L ed 713); *United Drug Co. v. Theodore Rectanus Co.*, 248 US 90 (39 S Ct 48, 63 L ed 141). Defendant's cut-rate sales have breached no such trade-mark rights of plaintiff. Plaintiff's trade-mark rights do not go as far as urged by it. *Sunbeam Corp. v. Wentling* (CCA), 192 F2d 7. They do not enable it to sell its cake and have it, too.

In seeking to distinguish this from the *Victor Case* Mr. Justice Butzel emphasizes that the latter involved horizontal price-fixing while here it is vertical. In the cases he cites and the many others on the subject the distinction between vertical and horizontal price-fixing arrangements is made as bearing on the question of whether a monopoly, trust or restraint of trade results and is pertinent to that question alone. The consideration of whether the price fixing be vertical, horizontal, or even diagonal, or whether the regulation relates to all of a certain type of commodity as in *Victor*, or only to a certain brand thereof as here, although relevant when the question of monopoly needs to be determined, is of no consequence in determining the point of difference between us, namely, whether the statute in question, as applied to nonsigners, bears any reasonable relation to public health, safety, morals or the general welfare. Neither is any relevancy to the latter question to be found in the interesting contemplation of whether the competition which most benefits the public is that between rival products or between retailers of the same product. If the act does not bear the mentioned relationship, then, as we held in *Victor*, it cannot be sustained as a lawful exercise of the State's police power, impairment of defendant's

rights under the due process clause results from its enforcement, and it is our duty to deny such enforcement and brand the act for what it is, unconstitutional.

Mr. Justice BUTZEL likewise distinguishes the *Victor Case* in that there the restriction was "automatic by legislative decree," while here, he states, it results from "voluntary agreement between the manufacturer and dealer." But defendant never entered into the agreement. As to it, the restriction is as "automatic by legislative decree" as in the *Victor Case*. The statement that the fair-trade act merely affords legislative protection to private contractual relations, true enough as relates to signers, overlooks the fact that the act ventures further, upon an unchartered sea of enforcement of contracts against those not party thereto. My Brother suggests that defendant's constitutional rights are not impaired by the statute because defendant is not obligated to buy or sell plaintiff's products if it does not desire to adhere to the minimum price fixed by plaintiff and enforced by statute. As much might have been said in the *Victor Case* in which the defendant was not obligated to engage in the business of buying and selling gasoline if he did not desire to comply with the restrictions of the statute.

Mr. Justice BUTZEL views the act as a valid exercise of the State's police power because, as he says, it is aimed at "destructive price cutting" and "the evils of a price war." Can it be said that by the process of reducing prices either war, destruction or evil are visited upon the public health, safety, morals or the general welfare? (That is the controlling question.) Such is not the concept upon which America's competitive economy was developed. It is further suggested by my Brother that the act serves, by placing an artificial weight on the one, to equalize the uneven race between the small

retailer and the large. While the relationship between that objective and the public health, safety, morals and the general welfare is hardly made to appear, there would be more force to the suggestion if my Brother did not limit its application, as he must under above noted decisions, to branded and trade-marked goods. Is not the survival of the small retailer made as difficult by the large retailer's cut-rate sales of bulk, unbranded and nontrade-marked staples as by the like sale of branded and trade-marked goods? The difference, if any, is scarcely such as to render the restriction on price-cutting valid in the one instance and invalid in the other. The difference in effect upon the general welfare in the 2 cases is difficult to discern.

Mr. Justice BUTZEL appears to concede that the business in question is not affected with a public interest and, clearly, it is not. See *Chas. Wolff Packing Co.* v. *Court of Industrial Relations of the State of Kansas,* 262 US 522 (43 S Ct 630, 67 L ed 1103, 27 ALR 1280) ; *Williams* v. *Standard Oil Co. of Louisiana,* 278 US 235 (49 S Ct 115, 73 L ed 287, 60 ALR 596). He does not question that, ordinarily, a person has the right to fix the price at which he sells his own property. That such is his right under the due process clause of the Federal Constitution, and that the power of a State legislature to restrict that right is limited to instances in which the business involved is affected with a public interest was held in *Tyson & Brother—United Theatre Ticket Offices, Inc.,* v. *Banton,* 273 US 418 (47 S Ct 426, 71 L ed 718, 58 ALR 1236); *Ribnik* v. *McBride,* 277 US 350 (48 S Ct 545, 72 L ed 913, 56 ALR 1327) ; *Williams* v. *Standard Oil Co. of Louisiana, supra.* The nub of Mr. Justice BUTZEL's contention, however, is that, despite that general rule, the minimum price restriction imposed by statute against nonsigners is sustainable as relates to branded and trade-marked articles because it there-

by protects the good will of the manufacturer; that this is a substantial property right which may be protected by legislative enactment. Against what action may the State protect it? Against theft, slander, simulation and the like, no doubt. The relationship between State action in that field and public health, safety, morals and the general welfare is obvious and has long been recognized. The attribute of good will which constitutes the property right which the State may, in certain respects, protect, is not the nebulous something calculated merely to inflate the owner's ego or satisfy his pride, but, rather, its propensity for producing business or sales. May every injury thereto or adverse effect be prevented by statute? This appears to be Mr. Justice BUTZEL's contention. The sales and business accruing to plaintiff by reason of its good will would undoubtedly be affected adversely by the manufacture and sale of a competitive product. Can it be contended successfully that a State statute prohibiting such competition and thus protecting plaintiff's sales accruing from its good will would bear a reasonable relation to public health, safety, morals and the general welfare? Obviously the answer must be no.

Price-fixing agreements involving or affecting interstate commerce were illegal under the Sherman anti-trust law (26 Stat 209) until certain exceptions were carved out under the amendment of section 1 thereof by the Miller-Tydings act of 1937 (50 Stat 693 [15 USCA, § 1]). See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 US 384 (71 S Ct 745, 95 L ed 1035, 19 ALR2d 1119). In that case it was held that the Miller-Tydings exemption from the operation of the Sherman act applies only to cases of signers of fair-trade agreements, when permissible under local law, but does not extend to cases of nonsigners of such agreements; that, lacking, thus, the

approval of Congress, the provision of the State statute making the fixed minimum resale price binding on nonsigners is invalid as relates to interstate commerce. Plaintiff seeks to avoid the effect of that holding on the ground that the transactions here involved are solely in intrastate commerce because they represent the sale by defendant in Michigan of articles manufactured by plaintiff in Michigan. This overlooks the full reach of the *Schwegmann* decision. In that case plaintiff shipped, from out-state, and sold its product to wholesalers in Louisiana who resold it, in intrastate commerce, to retailers and the latter sold it, in intrastate commerce to retail customers. In denying plaintiff the right to restraint of such retail sales at cut-rate prices the court looked to the effect on interstate commerce of the restraints on the intrastate, retail sales and held the latter, accordingly, subject to the reach of the Sherman act. Similarly, in *Sunbeam Corp.* v. *Civil Service Employees' Co-op Ass'n* (CCA), 192 F2d 572, plaintiff contended that, because defendant conducted only a local business, its retail sales were all in intrastate commerce subject to the State fair trade law and beyond the reach of the Sherman act. There, as in the *Schwegmann Case,* the goods originally came from without the State but came to rest in the hands of the wholesalers to whom plaintiff had sold, were resold by them in intrastate commerce to retailers and by the latter in intrastate commerce to retail customers. The court held that under the *Schwegmann* decision the local retail sales so affected interstate commerce as to come within the Federal purview, saying:

"It is the interstate character of Sunbeam's commerce that is crucial and governing for it is Sunbeam's price-fixing scheme which constitutes a trade restraint. This is the plan Sunbeam seeks to make nationwide by enforcing the nonsigner provisions

of local law in each of the States where a fair-trade act has been established. This marketing plan is quite similar to the one struck down by the supreme court in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.* (1911), 220 US 373 (31 S Ct 376, 55 L ed 502), where the pressure was applied against local stores making local sales."

To the same effect is *Lambert Pharmacal Co.* v. *Roberts Bros.,* 192 Or 23 (233 P2d 258). In that case the court said:

"And it is enough to bring the transactions complained of within the scope of the Sherman act that they substantially affect interstate commerce. * * *

"Nor does the fact that price-fixing or price maintenance applies only to intrastate retail sales remove the conduct from the reach of the statute if such conduct be 'an inseparable element of a larger program dependent for its success upon activity which affects commerce between the States.' *United States* v. *Frankfort Distilleries, Inc.,* 324 US 293, 297 (65 S Ct 661, 663, 89 L ed 951)."

In the instant case plaintiff has placed in operation a price-fixing scheme, national in scope, of which the Michigan phase is but a part. Success of the attempt at restraint on local sales is dependent upon success thereof as applied to national sales, and vice versa, so long as plaintiff's products are in fair and open competition with the products of others manufactured elsewhere than in Michigan. The restraint on local retail sales is a cog in the wheel imposing restraints on national sales. As such it affects interstate commerce and, accordingly, comes within the inhibition of the Sherman act. See 61 Yale Law Journal, pp 381, 396–398, and 46 Illinois Law Review, pp 349, 380–382.

Affirmed, with costs to defendant.

NORTH, C. J., and CARR, BUSHNELL, SHARPE, and BOYLES, JJ., concurred with DETHMERS, J.

BUTZEL, J. (*concurring*). The facts as far as developed by the pleadings and without a hearing have been presented by Mr. Justice DETHMERS. The sole question decided by the trial court is whether a Michigan manufacturer may invoke the Michigan fair-trade law as to sales of its products by a non-signing retailer. I dissent from his holding in so far as it holds that. the Michigan fair-trade act is invalid as to nonsigners of fair-trade agreements in intrastate commerce.

The legislatures looking after the general welfare have adopted laws. in the various States approving "fair trading" and the courts have almost uniformly held them constitutional. Mr. Justice DETHMERS has cited the decisions of the highest courts in 7 States and the United States supreme court to that effect. There should, also, be added the following decisions: *Fisher, Inc.,* v. *Canfield, Colorado Dist. Ct. for City and County of Denver,* No A 22837, Div 2 (CCH Trade Regulation Service, par 52,611); *Broff* v. *Silver Liquor Stores, Inc.,* 5 Conn Supp 288; *Auto Rental Co., Ltd.,* v. *Lee,* 35 Hawaii 77; *Pepsodent Co.* v. *Krauss Co.,* 200 La 959 (9 So2d 303); *W. A. Sheaffer Pen Co.* v. *Barrett,* 209 Miss 1 (45 So2d 838); *Rayess* v. *Lane Drug Co.,* 138 Ohio St 401 (35 NE2d 447); *Borden Co.* v. *Schreder,* 182 Or 34 (185 P2d 581); *Welch Grape Juice Co.* v. *Frankford Grocery Co.,* 36 Pa Dist and Co 653; *Miles Laboratories, Inc.,* v. *Seignious,* 30 F Supp 549 (applying South Carolina law); *Miles Laboratories, Inc.,* v. *Owl Drug Co.,* 67 SD 523 (295 NW 292); *Frankfort Distillers Corp.* v. *Liberto,* 190 Tenn 478 (230 SW2d 971); *Sears* v. *Western Thrift Stores of Olympia, Inc.,* 10 Wash2d 372 (116 P2d 756). Thus in a total of 20 State or Federal and Territorial courts, the nonsigner provision has

been upheld, and in but 1 jurisdiction—Florida—has it been declared unconstitutional. In the other 27 States in which fair trade laws are now in existence, they seem to have been applied without discussion of their constitutionality. For example, see *Iowa Pharmaceutical Association* v. *May's Drug Stores, Inc.*, 229 Iowa 554 (294 NW 756).

Examining the 1 dissent in the field, the Florida decision in *Liquor Store, Inc.*, v. *Continental Distilling Corp.*, 40 So2d 371, we find that the controlling reason for the court's determination was its re-examination of the economic soundness of fair-trade pricing in the light of changed economic conditions. The Florida holding was rejected in 2 later decisions, which, incidentally, were rendered at a time of similar economic conditions. The Mississippi and Tennessee courts, while noting the Florida dissent, aligned themselves with the majority authority on the issue and refused to re-examine the position of *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.*, 299 US 183 (57 S Ct 139, 81 L ed 109, 106 ALR 1476), and the leading State cases subsequent thereto.

Our own determination must, of course, be made after an examination of our own Constitution and governing law. However, believing as we do that the decisions of our sister States on identical issues, particularly when rendered in such overwhelming numbers, and the decision of the supreme court of the United States, should not be lightly disregarded, we should be inclined to rest our decision on the weight of authority alone if there were not reasons just as compelling for our ruling.

There is a presumption of constitutionality of every act of the Michigan legislature that entitles it to the highest respect by this Court. It is not our province to repeal a law which is constitutionally sound although it represents a change in the eco-

nomic public policy of the State of which certain of us may or may not approve. The only question is whether the restrictions of the statute have a reasonable relation to a proper purpose, in this case, the general welfare.

In *People* v. *Victor*, 287 Mich 506 (124 ALR 316), we laid down the test of reasonability of an economic regulation (syllabi):

"The right to engage in any business not harmful to the public is guaranteed by the Constitution.

"A business practice which has no detrimental effects to the public health, morals, safety and general welfare may not be prohibited by the legislature without resulting in a deprivation of property and liberty without due process of law.

"The constitutional right to engage in business is subject to such regulation as may be necessary to the public welfare, health, morals and safety."

Justice DETHMERS relies heavily on *People* v. *Victor* as authority that the instant legislation, attempting to regulate price, and bearing no reasonable relation to public health, morals, safety or the general welfare is not a legitimate exercise of the police power and violates the due process clause of our Constitution. The result of *People* v. *Victor*, however, is not controlling here.

At the outset, I emphasize that we are here concerned with *vertical* restrictions as to prices imposed by the manufacturer, not with *horizontal* agreements between retailers to regulate prices in intrastate commerce. Enforcement of the statute in the *Victor Case* which forbade the giving of a premium with the retail sale of gasoline, if we assume its result to be minimum price-fixing (the Court treated it as the forbidding of an unfair trade practice) would have had the effect of enforcing a *horizontal* price-fixing agreement between retailers of gasoline and without the consideration of the interests of the manufac-

turer. It is on this distinction that many courts have upheld fair-trade laws against constitutional objections going to the scope of the police power. See *Joseph Triner Corp.* v. *McNeil,* 363 Ill 559 (2 NE2d 929, 104 ALR 1435); *Pepsodent Co.* v. *Krauss, supra; W. A. Sheaffer Pen Co.* v. *Barrett, supra; Ely Lilly & Co.* v. *Saunders,* 216 NC 163 (4 SE2d 528, 125 ALR 1308); *Sears* v. *Western Thrift Stores of Olympia, Inc., supra,* for instances where this distinction was made.

*People* v. *Victor* concerned the regulation of all of a certain type of commodity. The fair trade acts apply only to those commodities in "fair and open competition" with other commodities of the same general class and do not serve to stifle the most desirable competition, that between different brands of the same commodity. Manufacturer's price-fixing under the authority of the fair-trade act concerns only all of one brand or trade-marked commodity; not all of the commodity itself whatever its origin. Price-fixing is allowed for those commodities which are in fair and open competition with those produced by others. See dissent of Mr. Justice Holmes in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 US 373 (31 S Ct 376, 55 L ed 502); for an early statement of the view that it is an economic fallacy to assume that the competition which benefits the public is between retailers of the same product; it is between rival articles, a competition in excellence. See, also, discussion in *Ely Lilly & Co.* v. *Saunders, supra.*

Unlike the controls struck down in the *Victor Case,* control of minimum price under the fair trade laws is not automatic by legislative decree but comes about as a result of voluntary agreement between the manufacturer and dealer which is then enforced against a nonsigner with notice as a means of protecting the value of the manufacturer's trade-mark

or brand. The nonsigner is neither obligated to buy or sell the manufacturer's products if he does not wish to adhere to such voluntarily-established prices. For this reason, many courts have held that the result of the fair-trade act is merely the legislative protection of a private contractual relation. See *Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra; Max Factor & Co. v. Kunsman,* 5 Cal 2d 446 (52 P2d 177); *Pepsodent Co. v. Krauss Co., supra; Frankfort Distillers Corp. v. Liberto, supra;* and *Weco Products Co. v. Reed Drug Co.,* 225 Wis 474 (274 NW 426).

In the *Victor Case* we emphasized that there was no showing that the blanket prohibition of the practice of giving premiums would tend to alleviate destructive price cutting; indeed, the Court implied that a statute directly aimed at the evils of a gasoline price war might be constitutional. Here, there is a considerable body of opinion to indicate that the use of brand name products for "loss leaders" and destructive price cutting is an evil which may validly be regulated by the manufacturer with the aid of the State through the fair-trade laws.

The bases of the fair-trade regulations under the police power are 2: (1) Right of the plaintiff-manufacturer to be free from injury to the good will of his business as a result of price cutting on distinctive goods; (2) Right of the plaintiff to protect one retailer from the price-cutting tactics of another with regard to such product, as a means of promoting that good will.

The Michigan fair-trade law was passed, like those in the vast majority of States, to protect the manufacturer in the sale of his individual product, when identified by some kind of distinctive markings on the product or package delivered to the consumer. The protection of the good will of the manufacturer is a legitimate object of the fair-trade act. It is not

an agreement between retailers to fix a price. It protects the manufacturer who seeks to maintain the excellence of his product. The public is not obliged to buy it; it may purchase competitive products. It prevents price wars in a particular product which are harmful or disastrous to the manufacturer's business. It also protects the small retailer, who must meet the competition of the larger store dealing in general merchandise and which is able to cut prices below cost of fair-trades merchandise or sell it at a minimum or no profit, and thus attract trade, possibly permanently, for the purchase of other articles. The use of what are commonly known as "loss leaders" thus may become ruinous to the small retailer. It necessarily will have a harmful effect on the manufacturer who is trying to protect his business.

Mr. Justice DETHMERS argues that plaintiff's trade-mark rights were not breached by defendant's cut-rate sales. It is true that a cut-rate sale does not represent the theft or appropriation of a trade-mark in itself, but it represents an injury to the good will attached thereto which might be as serious to the manufacturer. There exists, therefore, a substantial property right which may be protected by the legislative enactment. The United States supreme court expressed itself on the subject in the *Old Dearborn Case, supra,* as follows:

"Nor is section 2 so arbitrary, unfair or wanting in reason as to result in a denial of due process. We are here dealing not with the commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or good will that the mark symbolizes. The good will is property in a very real sense, injury to which, like injury to any other

species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business—sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will 'is entitled to protection as against one who attempts to deprive him of the benefits resulting from the same, without his consent and authority.' *McLean* v. *Fleming,* 96 US 245, 252 (24 L ed 828). 'Courts afford redress or relief on the ground that a party has a valuable interest in the good will of his trade or business, and in the trademarks adopted to maintain and extend it.' *Hanover Star Milling Co.* v. *Metcalf,* 240 US 403, 412 (36 S Ct 357, 60 L ed 713). The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity had been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statutes denominated 'unfair competition.' See *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Cooperative Marketing Ass'n,* 276 US 71, 91, 92, 96, 97 (48 S Ct 291, 72 L ed 473)."

See, to similar effect: *Max Factor & Co.* v. *Kunsman, supra; Ely Lilly & Co.* v. *Saunders, supra; Sears* v. *Western Thrift Stores of Olympia, Inc., supra.* I conclude that this legislation aids the manufacturer in the protection of a valuable property and contractual right and, therefore, unlike the legislation we struck down in the *Victor Case,* such regulation is proper for the public welfare.

Defendant argues that the Michigan fair-trade law constitutes a discriminatory protection of only one class of commodities against price cutting; that it is merely an attempt to fix prices for the private benefit of one class as against others. Does the protection of brand, trade-marked, or otherwise distinctive merchandise against price cutting amount to an unconstitutional classification? In ordinary pursuits unaffected with a public interest, a classification which confers upon one category of businessmen special privileges is discriminatory and invalid as class legislation. See *People, ex rel. Valentine,* v. *Berrien Circuit Judge,* 124 Mich 664 (50 LRA 493, 83 Am St Rep 352); *People, ex rel. Attorney General,* v. *Sperry & Hutchinson Co.,* 197 Mich 532 (LRA 1918A, 797); *Peninsular Stove Co.* v. *Burton,* 220 Mich 284; and *Levy* v. *City of Pontiac,* 331 Mich 100. Such, however, is not the present case.

There are several decisions from other jurisdictions applying similar constitutional provisions to fair-trade laws. In *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp., supra,* it was held that such classification was not invalid, for, in fact, trade-marked and branded goods are in a class by themselves. In *Max Factor & Co.* v. *Kunsman, supra; Joseph Triner Corp.* v. *McNeil, supra; Ely Lilly & Co.* v. *Saunders, supra;* and *Miles Laboratories, Inc.,* v. *Owl Drug Co., supra,* this objection was also held to be unfounded. The Illinois court stated in the *Joseph Triner Case:*

"[The classification is] based on a real and substantial difference having a rational relation to the subject of the particular legislation."

There is no problem under the equal protection clause. Other courts, and numerous ones, merely followed the rule of the *Old Dearborn Case* without further discussion of the issue. The Florida court

was the sole dissenting voice when it held that trademarked goods were being given special protection unconstitutional in nature.

I am in accord with the holding of the *Old Dearborn Case* and those following it. The manufacturer possesses a property right in identifiable goods which does not exist in nonidentifiable goods and this may properly be made the basis of regulation protecting one class and not the other.

Defendant argues that the fair-trade law represents an unlawful delegation of price-fixing power to private persons. That legislative power may not be delegated in Michigan was settled by *G. F. Redmond & Co.* v. *Michigan Securities Commission,* 222 Mich 1; *Chemical Bank & Trust Co.* v. *County of Oakland,* 264 Mich 673; and *Argo Oil Corp.* v. *Atwood,* 274 Mich 47. However, we do not have here an instance of such unlawful delegation.

I find unfounded defendant's argument that—

"Except for the Florida court, *supra,**  little consideration is given in the decisions to the fact that the effect of the act is to delegate price-fixing power to individual manufacturers or suppliers without any standards or criteria controlling the exercise of such powers."

In *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp., supra,* it was stated that no unlawful delegation of power existed as only sales by the manufacturer made subsequent to the establishment of the fair-trading system could be subject to its provisions, and that no retailer therefore needed to be bound by it unless he so desired. Similar contentions were rejected in *Goldsmith* v. *Mead Johnson & Co.,* 176 Md 682 (7 A2d 176); *W. A. Sheaffer Pen Co.* v. *Barrett, supra; Johnson & Johnson* v. *Weiss-*

---

* Reference is to *Liquor Store, Inc.,* v. *Continental Distilling Corp.*— REPORTER.

*bard,* 121 NJ Eq 585 (191 A 873); *Bourjois Sales Corp.* v. *Dorfman,* 273 NY 167 (7 NE2d 30, 110 ALR 1411); *Weco Products Co.* v. *Reed Drug Co., supra; Joseph Triner Corp.* v. *McNeil, supra;* and *Ely Lilly & Co.* v. *Saunders, supra.* Florida was again the only dissenter when it held that there was no review of the act of price fixing and it was, therefore, an illegal delegation.

The standards governing the delegation of power are inherent in the act itself. The manufacturer's prices are controlled by competition or the act is not brought into play. Fair trading of articles is permissible only when there exists "free and open competition." We have here a grant of power over the conduct of others growing out of a basic property right, and then and only then may it be exercised. I am, therefore, in accord with majority authority that there has been no unlawful delegation of price-fixing power.

It has been said that freedom of contract of the retailer is violated by the nonsigner provision of the act. But no retailer is obliged to buy any identifiable commodity and upon doing so with knowledge he should be held to have accepted the consequence. He is only punished if he advertises at below fair-trade prices wilfully and knowingly. He is privileged to sell if the commodity is not identified with its trade-mark or brand name on the commodity or the package or wrapper. See *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp., supra; W. A. Sheaffer Pen Co.* v. *Barrett, supra; Johnson & Johnson* v. *Weissbard, supra;* and *Sears* v. *Western Thrift Stores of Olympia, Inc., supra,* for further discussion.

Defendant has other objections going to the validity of this legislation as an exercise of police power under the due process clause. It contends that the legislative labeling of simple price reduction as "un-

fair competition" is not binding on the court. This might well be true if there were shown us "simple" price reduction with no other circumstances; but price reduction under circumstances which tend to injure a property right of the manufacturer may properly be a subject of regulation. For the same reason, the issuance of an injunction under these circumstances may be made mandatory by legislative fiat without a violation of the due process clause if the legislature feels such to be desirable.

I have carefully examined all of defendant's arguments going to the constitutionality of the statute herein and have rejected them for the reasons stated above or set forth in other leading cases I have cited on identical issues, which it would be useless to further review. Our conclusion then should be that this act is a valid exercise of the police power of this State as applied to wholly intrastate transactions; that it is wholly constitutional and is properly enforceable by a court of equity in cases coming within its purview. I am, therefore, in total disagreement with the decision of the trial court which was based on the constitutionality of the fair-trade act under the Constitution of the State of Michigan.

The question of the validity of the application of the fair-trade act under the laws of the United States was first raised in the briefs of both parties in the instant case, and I am in accord with the opinion of Mr. Justice DETHMERS to the extent that it holds that the act cannot be enforced against nonsigners of fair-trade agreements concerning articles sold in interstate commerce. This was the holding of the majority of the United States supreme court in *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 US 384 (71 S Ct 745, 95 L ed 1035, 19 ALR2d 1119). Additional cases cited by Mr. Justice DETHMERS would indicate that all of plaintiff's goods sold in a nationwide distribution program are to be construed

as goods sold in interstate commerce even though the actual sale was an intrastate one, and thus that the *Schwegmann* decision applies to plaintiff's goods sold in Michigan, since plaintiff sold in interstate as well as intrastate commerce, as well as to those sold out of the State. A very recent case decided by an intermediate appellate court in California is to a like effect. *Cal-Dak Co.* v. *Sav-On Drugs, Inc.,* 110 Cal App2d 204 (242 P2d 333).

There is legislation pending in the United States Congress which would legalize enforcement of fair-trade agreements against nonsigners in interstate commerce, and restore the situation which existed before the *Schwegmann* decision, making fair-trade laws of a State effective also as to fair-trade articles of interstate commerce sold within the State. If such a law is passed the Michigan fair-trade law, if upheld under the State Constitution, would be effective in both intrastate and interstate commerce. The decision, as to its validity under the Michigan Constitution is, therefore, important, and it can be only assailed at the present time on the ground that it offends the present Federal law as set forth in the *Schwegmann Case.*

For the reasons above stated, I concur in the result reached by Mr. Justice DETHMERS.

REID, J., concurred with BUTZEL, J.