ARGUS CAMERAS, INC., *v.* HALL OF DISTRIBUTORS, INC.

1. TRADE-MARKS AND TRADE NAMES—STATUTES—FAIR-TRADE AGREEMENTS—NONSIGNERS.

State statute declaring that advertising, offering for sale or selling of a commodity which bears the trade-mark, brand, or name of the producer or owner and which is in fair and open competition with commodities of the same general class at a price that is less than that set by the producer or vendor is unfair competition and actionable at the suit of any person damaged thereby is unconstitutional as applied to persons who have not signed a so-called fair-trade agreement whereby they agree to abide by the producer's minimum prices on the products, since it constitutes a deprivation of property without due process of law (Const 1908, art 2, § 16; CL 1948, § 445.151 *et seq.*).

2. CONTRACTS—NONPERFORMANCE—PUBLIC POLICY.

One is privileged by proper means to induce the nonperformance of a contract or bargain, the purpose or effect of which is to restrict his business opportunities in violation of a defined public policy.

3. INJUNCTION—TRADE-MARKS AND TRADE NAMES—FAIR-TRADE AGREEMENTS—STATUTES—PARTIES.

Defendant who is not a party to a so-called fair-trade contract, whereby plaintiff manufacturer set the price at which its products were to be sold, may not be enjoined from purchasing the products of plaintiff from signers of such contracts nor from selling the products at prices less than prices fixed by plaintiff (CL 1948, § 445.151 *et seq.*).

BUTZEL, BOYLES, and KELLY, JJ., dissenting.

Appeal from Wayne; FitzGerald (Frank), J. Submitted April 12, 1955. (Calendar No. 46,393.) De-

REFERENCES FOR POINTS IN HEADNOTES

[1] 52 Am Jur, Trade-marks, Tradenames, and Trade Practices § 189.
[2] 30 Am Jur, Interference § 18 *et seq.*
[3] 52 Am Jur, Trade-marks, Tradenames and Trade Practices § 187 *et seq.*

cided October 3, 1955. Rehearing denied December 1, 1955.

Bill by Argus Cameras, Inc., a Michigan corporation, against Hall of Distributors, Inc., a Michigan corporation, and certain of its officers, to enjoin alleged tortious interference with plaintiff's contracts aimed to keep its product fair-traded. Order for temporary injunction. Defendants appeal. Reversed and remanded.

*Clark, Klein, Brucker & Waples* (*Robert C. Winter* and *Wilber M. Brucker, Jr.,* and *George M. Chapman,* of counsel), for plaintiff.

*Nathan L. Milstein* and *Charles Rubiner* (*Arthur James Rubiner,* of counsel), for defendants.

*Amicus Curiae: Hill, Lewis, Andrews, Granse & Adams* (*Thomas H. Adams, Edward T. Goodrich, Herman T. Van Mell* and *Stanley A. Weigel,* of counsel), for Sunbeam Corporation.

REID, J. Upon leave granted, defendants appeal from a temporary injunctive order of the circuit court. Plaintiff filed the bill in chancery seeking to enjoin defendants from tortiously interfering with plaintiff's contracts with wholesalers and retailers, to which contracts the defendants are not parties; from inducing breaches of plaintiff's said contracts and from conspiring and committing acts tending to restrain trade and to create a monopoly in the sale of plaintiff's products bearing plaintiff's trade-mark.

Plaintiff is a manufacturer of cameras, et cetera, and alleges that defendants are retailers who sell plaintiff's products but who are not parties to any fair-trade agreement, either with plaintiff or with any of plaintiff's wholesalers or distributors. Plaintiff charges that defendants have tortiously inter-

fered with plaintiff's contracts and that defendants have induced dealers to breach their contracts. Defendants admit that they have sold plaintiff's products for less than the price established in the contracts between plaintiff and signers of contracts with plaintiff. Defendants maintain that as nonsigners they are within their legal rights in setting their own prices for such products. Defendants further deny that they have tortiously interfered with any of plaintiff's contracts or induced any breach thereof.

Plaintiff claims that defendants obtained Argus cameras by inducing other dealers to breach their contracts; that they use the goods thus obtained to cut prices; that the defendants by cutting prices, interfere with the contract Argus has with other dealers; that the defendants are fast creating a monopoly. Plaintiff claims further that the defendants profit by an increase in their volume of sales at the expense of Argus and its dealers who have created the demands for the goods that the defendants sell; that the defendants' interest therefore must be weighed against the interest and investment of plaintiff Argus and the hundreds of other retailers who wish to profit by the sale of Argus products; plaintiff further claims that the defendants' selfish interests must be weighed against the desire of consumers to be able to purchase Argus cameras from their regular camera dealers instead of from price cutters; plaintiff further claims that the desire of defendants to cut prices must be further weighed against the inherent monopoly in the course that defendants pursue. The temporary injunction granted by the trial court is as follows:

"It is hereby ordered that a temporary injunction shall be issued,

"And it is further ordered that the said defendants, and each of them, their respective officers, directors, agents, employees, servants, affiliates, successors, heirs and assigns, and all persons acting in concert or participation with them or any of them, are hereby strictly commanded, restrained and enjoined

"(a) From interfering with the operation and effect of and from impairing or otherwise depriving Argus Cameras, Inc., of the benefits of its fair-trade contracts and its lawful right in the State of Michigan to confine the distribution of its trade-marked products solely through wholesale and retail distributors and dealers who are willing to enter into such contracts by mailing or otherwise disseminating in the State of Michigan circulars, catalogs, mailing pieces or any other form of advertising, or in any other manner offering for sale or selling or delivering for sale in the State of Michigan any Argus products, bearing its trade-mark and covered by plaintiff's said fair-trade contracts, at less than the prices established thereby as the same are in force and effect from time to time and of which the defendants shall have notice;

"(b) From inducing or attempting to induce wholesale and/or retail distributors and dealers of Argus products to violate their contracts with Argus Cameras, Inc., by purchasing Argus products from any retailer at less than the minimum prices established pursuant to an Argus retailer fair-trade contract in effect between such retailer and Argus Cameras, Inc., or by purchasing any Argus product from any wholesaler in violation of the provisions of an Argus wholesaler fair-trade contract in effect with such wholesaler, or by inducing any retailer to enter into an Argus retailer fair-trade contract with Argus Cameras, Inc., for the purpose of supplying any Argus product to defendants or any of them in violation of such contract, from purchasing, directly or indirectly, Argus products from any person, firm or corporation which has entered

into an Argus retailer fair-trade contract or an Argus wholesaler fair-trade contract, where defendants, or any of them, have notice or knowledge of such contract, and from inducing or attempting to induce wholesale and retail distributors and dealers of Argus products to violate their contracts with Argus Cameras, Inc., either directly or by means of any subterfuge, sham or other indirection;
"until the further order of this court."

The act under which the contracts between plaintiff Argus and its wholesalers and distributors were executed, is PA 1937, No 50 (CL 1948, § 445.151 *et seq.* [Stat Ann 1953 Cum Supp § 19.321 *et seq.*]).

Defendants rely upon the decision of this Court in *Shakespeare Company* v. *Lippman's Tool Shop Sporting Goods Co.*, 334 Mich 109. In the *Shakespeare Case* we say (syllabus 1):

"State statute declaring that advertising, offering for sale or selling of a commodity which bears the trade-mark, brand, or name of the producer or owner and which is in fair and open competition with commodities of the same general class at a price that is less than that set by the producer or vendor is unfair competition and actionable at the suit of any person damaged thereby is unconstitutional as applied to persons who have not signed a so-called fair-trade agreement whereby they agree to abide by the producer's minimum prices on the products, since it constitutes a deprivation of property without due process of law (Const 1908, art 2, § 16; CL 1948, § 445.151 *et seq.*)."

Defendants claim there is considerable doubt as to whether they would be guilty of plaintiff's charges even if the defendants did induce the nonperformance of plaintiff's fair-trade contracts by their wholesalers and distributors, for the purpose of acquiring merchandise.

We quote from 4 Restatement, Torts, § 774, as follows:

"*One is privileged by proper means to induce the nonperformance of a contract or bargain, the purpose or effect of which is to restrict his business opportunities in violation of a defined public policy.*

"Comment:

"a. The privilege stated in this section enables a person to protect himself by proper means against restrictions on his business opportunities when the restrictions violate a defined public policy. In some cases such a restriction may be the avowed purpose of the interrupted arrangement; in others this may be the effect, in view of the administration of the arrangement or other circumstances, whether or not it is the purpose. It is not enough, however, that the contract or bargain involved restricts the actor's business opportunities. Every contract limits in some degree the opportunities of persons not parties to the contract. Such a restriction is ordinarily deemed desirable both in the public and the private interest. However, some restrictions may work prejudice to both interests. Accordingly, contracts in unreasonable restraint of trade are generally unenforceable even against the contracting party. The rule stated in this section is not limited, however, to such contracts. Though the contract may be enforceable in some manner between the parties, one whose business opportunities are restricted by it may be able to survive only through a breach of the restriction; and this breach he is privileged to seek by proper means, if the restriction violates public policy."

Defendants further claim that the public policy of Michigan was set forth in the *Shakespeare Case, supra.* Defendants seem not to dispute that the fair-trade contracts entered into between plaintiff Argus and its wholesalers and distributors are valid as between the parties to such contracts, but defend-

ants claim that as to nonsigners of such contracts, such nonsigners are guiltless of tort, though they purchase from a signer.

Under the allegations contained in the bill, plaintiff fails to state a case for equitable relief, in view of the decision of this Court in the *Shakespeare Case.* We consider that the *Shakespeare Case, supra,* laid down a principle of law, the fair implication of which is such that under the law of Michigan thus established, defendants, nonsigners (of so-called fairtrade agreements with plaintiff) must not be enjoined from purchasing the products of plaintiff Argus from signers, nor from selling the products at prices less than prices fixed by plaintiff.

The temporary injunctive order is reversed. We remand the case to the trial court for further proceedings, if any. Costs to defendants.

CARR, C. J., and SHARPE and DETHMERS, JJ., concurred with REID, J.

BUTZEL, J. (*dissenting*). The sole question before us is the propriety of the trial court's order granting the preliminary injunction. In *Niedzialek* v. *Journeymen Barbers, Hairdressers & Cosmetologists' International Union of America, Local 552, AFL,* 331 Mich 296, 302, a suit to restrain picketing, we adopted the words of another court in reference to a preliminary injunction (*Goldfield Consolidated Mines Co.* v. *Goldfield Miners' Union No 220,* 159 F 500, 511, 512):

"It is not necessary that the complainant's rights be clearly established, or that the court find complainant is entitled to prevail on the final hearing: It is sufficient if it appears that there is a real and substantial question between the parties, proper to be investigated in a court of equity, and in order to

prevent irremediable injury to the complainant, before his claims can be investigated, it is necessary to prohibit any change in the conditions and relations of the property and of the parties during the litigation."

Is there a real and substantial question involved in this case? At the present time we only consider the cause of action alleging tortious procurement of breach of contract between plaintiff and those with whom it signed contracts to maintain minimum or stipulated resale prices.

In *Krause* v. *Hartford Accident & Indemnity Co.,* 331 Mich 19, 25, we stated:

"From the early case of *Lumley* v. *Gye,* 2 El & Bl 216 (118 Eng Rep 749, 22 LJ QB [NS] 463), most of the common-law courts have adopted and enlarged upon the idea that unlawful interference with another's contract rights constitutes an actionable tort. In general that proposition has been adopted in this jurisdiction. See *Morgan* v. *Andrews,* 107 Mich 33; *Wilkinson* v. *Powe,* 300 Mich 275. But the interference must be unlawful in character."

In *Wilkinson* v. *Powe,* 300 Mich 275, 282, there referred to, we said:

"A prima facie case is established when plaintiff proves the intentional procurement of a breach of contract, and, upon such proof, it becomes incumbent upon defendant to show justification."

Quoting from another case, *E. L. Husting Co.* v. *Coca Cola Co.,* 205 Wis 356, 366 (237 NW 85, 84 ALR 22, 29), we further stated (pp 282, 283):

"The great weight of authority in this country and in England is to the effect that, if A has a legal contract with B, either for the rendition of service or any other purpose, and C, having knowledge of the existence thereof, intentionally and knowingly,

and without reasonable justification or excuse, induces B to break the contract, by reason of which A sustains damage, an action will lie by A against C to recover the same. * * * The action of C is malicious, in that, with the knowledge of A's rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing B to break his contract. It is a wrongful act, done intentionally, without just cause, or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without legal or social justification."

The plaintiff alleges and the defendants admit that they are informed of the plaintiff's fair-trade contracts and the prices established thereunder. To support their allegation that defendants procured their cameras from, and thus caused breach of contract by, plaintiff's dealers and distributors, it is alleged in the complaint that:

"The distribution of plaintiff's products is restricted only to those wholesalers and retailers who have voluntarily entered into fair-trade contracts with it."

In their answer defendants neither admit nor deny this allegation. The affidavit of Dudley J. Scholton, plaintiff's vice-president in charge of sales, states:

"We have negotiated contracts with all wholesalers handling our product."

The affidavit of Robert E. Woolson, plaintiff's field sales manager, states:

"Since 1947, all Argus products have been sold subject to fair-trade contracts in all of the States having fair-trade laws."

However, in their answer defendants deny the allegation that they induced breach of contract and

in an affidavit in answer to that of Scholton, the defendants again

"deny that they have induced other dealers or wholesalers to breach their fair-trade contract obligation to Argus."

The trial judge, while noting the defendants' denials, stated:

"There is no mention in any of the affidavits of how the products were acquired.

"The plaintiff has shown, by affidavits, that its products were in the hands of the defendants. It has shown that it has religiously refrained from selling any of its products to anyone other than its contract holders. If the plaintiff has given some evidence that the defendants did make such purchases for their own benefit and that they do have the plaintiff's products in their possession, I believe a legitimate inference can be drawn from such circumstances that the products were acquired by the defendants through inducement of contract holders to breach their contracts."

The manner in which defendants obtained the cameras is a matter peculiarly within their own knowledge and their failure to indicate otherwise leaves no choice but to indulge in that inference.

It is clear that Michigan recognizes the tort alleged and that a cause of action is stated by the complaint. While there has been no case in this Court concerned with this precise set of facts as constituting procurement of breach of contract, we note that in a similar case the Federal court considered that such a complaint stated a cause of action. *Sunbeam Corp. v. Payless Drug Stores,* 113 F Supp 31 (N. D. California 1953). The district court for the eastern district of Michigan has reached the same conclusion in 2 cases. *Sunbeam Corp. v. Economy Distributing Co., Inc.,* civil action No. 13900; *Sun-*

*beam Corp.* v. *Hall of Distributors, Inc.,* 131 F Supp 791, civil action No 14000 (preliminary injunctions granted in both cases).

Defendants contend that assuming *arguendo* their procurement of breach of contract, they are legally justified in doing so. They raise a question as to the constitutionality of the fair-trade law and consequent illegality of plaintiff's contracts, as well as our decision in *Shakespeare Company* v. *Lippman's Tool Shop Sporting Goods Co.,* 334 Mich 109. I am bound by the majority opinion in that case though I dissented, in part, as to the merits of the issue. However, I cannot agree with my Brother REID as to the implications and scope of the majority opinion. The only thing there decided was that the nonsigner provision of the act was unconstitutional as to nonsigners of fair-trade agreements. We did not hold that the act was unconstitutional as to signers of such agreements. As we do not here consider the constitutionality of the act as to signers of fair-trade agreements, plaintiff's contracts must, for purposes of this opinion, be considered valid and enforceable. While the *Shakespeare Case* solely holds that nonsigners are not bound by the contracts, it does not leave nonsigners free to engage in what is otherwise tortious activity. We, therefore, must conclude that there exists a real and substantial controversy between the parties which does afford a basis for preliminary relief.

Other factors are necessarily considered in granting or denying preliminary relief. In *Cohen* v. *Detroit Joint Board Amalgamated Clothing Workers of America,* 327 Mich 606, 610, where we reversed a trial court's refusal to grant a temporary injunction, we said:

"In granting or withholding injunctive relief *pendente lite* in a case of this character it is highly proper and quite essential for a court to consider

whether the rights of the respective litigants will best be subserved by granting temporary injunctive relief if sought. If the personal rights or property rights involved will best be preserved by granting temporary injunctive relief in a suit presenting issues of controversial merit, such relief should be granted. *Gates* v. *Detroit & Mackinac Railway Co.,* 151 Mich 548."

In *Steggles* v. *National Discount Corp.,* 326 Mich 44, 50 (15 ALR2d 208), we noted:

"The general rule is that whenever courts have found a mandatory injunction essential to the preservation of the *status quo* and a serious inconvenience and loss would result to plaintiff and there would be no great loss to defendant, they will grant it."

We further recognized in that case that the plaintiff's loss was a continuing one and that the *status quo* to be preserved was the "last actual, peaceable, noncontested status which preceded the pending controversy."

It is readily apparent that left unchecked defendants' conduct would, in a matter of time, result in leaving plaintiff's good will and distribution system in a substantially irreparable and chaotic condition. As compared with the loss which defendants might suffer by the granting of preliminary relief, plaintiff's must be more highly regarded and protected.

Plaintiff's affidavits in support of its claim to temporary injunction are very convincing. They show in no uncertain terms that plaintiff conducts a very large and well-established business engaged in manufacturing and selling a popular and well known camera and that millions of dollars have been expended in advertising; that defendants are appropriating the good will so established to their own advantage by tortiously inducing others to break their fair-trade agreements. Plaintiff's business has

grown to a large extent by protecting the retailer through fair-trade or minimum retail price agreements. Many retailers, and particularly those, conducting smaller camera shops dealing in plaintiff's products, have thus built up successful businesses which plaintiff alleges now are being destroyed through defendants' tortious conduct in inducing others to violate their fair-trade agreements with plaintiff. This has had a disastrous effect on the dealers, as well as on plaintiff. As a result many dealers who respected their contracts have been forced out of business, while others threaten to discontinue selling plaintiff's products. It can readily be seen that a concern that sells a fair-trade article at below the minimum price agreed upon may drive out a legitimate dealer and thus create a monopoly in itself. It can sell at a low price either as a loss leader or as a bait to get customers to buy other products, or through a large volume of sales make a profit. It also affects the manufacturer. The affidavits show that in the first 7 months of 1954, plaintiff's sales in Michigan declined 37% as against the same period in 1953, while the national sales increased 33%; that during the same period in 1953, 17.4% of plaintiff's sales were made in Michigan, in 1954 during this period only 8.2% were made in Michigan. The showing in itself is sufficient to fully justify the trial judge to issue a temporary injunction.

It is equally apparent that the "last actual, peaceable, noncontested status which preceded the pending controversy" in this case goes back to the point at which defendants allegedly unlawfully secured the cameras from those under contract with plaintiff. We do not think that the date that plaintiff demanded that defendants cease their practices is determinative of the *status quo,* but rather we are here

concerned with *status quo* consistent with the theory of the cause of action alleged by plaintiff.

Defendants further contend that a sworn answer and counteraffidavits preclude the granting of temporary relief. While possibly this may be a general rule, we have held that it is solely a matter of judicial discretion. *Mactavish* v. *Kent Circuit Judge,* 122 Mich 242. We have in the past approved of the granting of an injunction *pendente lite* "notwithstanding the defendant's sworn answer refuting the essential allegations of the bill of complaint." *Seifert* v. *Buhl Optical Co.,* 276 Mich 692, 695. As the granting of preliminary relief is discretionary with the court of original jurisdiction, the Supreme Court will not interfere except on very clear or strong grounds or where such discretion is palpably abused. *Flemming* v. *Heffner & Flemming,* 263 Mich 561; see *Seifert* v. *Buhl Optical Co., supra,* at 699, 700, where we affirmed the granting of a temporary injunction saying:

"The trial judge did not abuse his discretion in his attempt to preserve the *status quo* by providing for plaintiffs' retention of business which they otherwise might lose through defendant's unlawful methods of advertising."

While more doubtful if based upon plaintiff's other 2 causes of action, the part of the injunction restraining defendants from selling at less than the fair-trade price is necessary to the efficacy of the order prohibiting them from procuring breach of contract. Not to allow it would be to permit defendants to reap the fruits of their alleged tortious conduct.

Since the filing of the briefs and the oral argument our attention has been directed to *Sunbeam Corp.* v. *Masters of Miami, Inc.* (CCA), 225 F2d 191, decided July 22, 1955, under Florida law. There the

court of appeals for the fifth circuit, in a 2 to 1 decision, dismissed a complaint similar to that of Argus in this case, relying upon 4 Restatement, Torts, § 774. The application of the Restatement rule expressly depends upon a determination of the public policy of the jurisdiction in question. The history of the Florida fair-trade laws and the forceful language employed by the Florida court in declaring succeeding nonsigner provisions unconstitutional led the majority of the court of appeals to conclude that the fair-trade contracts in question violated Florida public policy. As of that time Florida had declared the law invalid as to nonsigners but had never squarely held the remainder of the law unconstitutional. The majority of the court of appeals deemed it unnecessary to decide the validity of the Florida law as to signers of contracts, but nevertheless concluded that the contracts violated public policy. While we agree entirely with the dissenting opinion which questions the majority's conclusion as to Florida public policy, it is important and decisive to note that neither the judicial nor legislative history of fair trade in Michigan is comparable to that of Florida. In the *Shakespeare Case, supra,* we did not attack the theory and economic basis underlying fair-trade laws, as had the Florida court, but rather the majority of our Court limited its decision to the validity of the nonsigner provision depending to a large extent upon a nonfair-trade precedent. Therefore, Michigan has not, as has Florida, expressed repeated and sweeping judicial condemnations of fair trade. On the contrary we have only had the unequivocal expression of the legislature permitting fair-trade contracts such as plaintiff's. This is the present public policy of Michigan.

Statutes legalizing fair-trade agreements have been enacted in 45 States. The Miller-Tydings amendment to the Sherman Act, 50 Stat 693, amend-

ing 15 USCA, § 1, permits them, and many cases, notably *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.* (1936), 299 US 183 (57 S Ct 139, 81 L ed 109, 106 ALR 1476), have validated them. Within the past 6 months the Pennsylvania supreme court has upheld, as against all arguments, the constitutionality of its act as to a nonsigner and thus presumably as to signers as well. *Burche Co.* v. *General Electric Co.* (1955), 382 Pa 370 (115 A2d 361). To be sure some 5 States, Michigan included, have held the nonsigner provision invalid. However, we have never held that the law is not valid as to signers. It is not within our province to declare that plaintiff's contracts violate public policy, and especially not at a preliminary hearing.

We, therefore, should affirm the order appealed from, with costs.

BOYLES and KELLY, JJ., concurred with BUTZEL, J.

SMITH, J., took no part in the decision of this case.